# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 08-2819

RIVER OF LIFE KINGDOM MINISTRIES,

*Plaintiff-Appellant,*

*v.*

VILLAGE OF HAZEL CREST, ILLINOIS,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 950—**Joan B. Gottschall**, *Judge.*

ARGUED FEBRUARY 24, 2010—DECIDED JULY 2, 2010

Before EASTERBROOK, *Chief Judge*, and CUDAHY, POSNER, FLAUM, MANION, KANNE, ROVNER, WOOD, WILLIAMS, SYKES, TINDER, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. The court granted rehearing en banc to consider the proper standard for applying the equal-terms provision of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc. That provision states that "no government shall impose or implement a land use regulation in a manner that treats

a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." § 2000cc(b)(1).

The appellant, River of Life, is a small church (it has 67 members, only about half of whom attend services on an average Sunday) that at present operates out of rented space in a cramped, dirty warehouse in Chicago Heights, a town 27 miles south of downtown Chicago. It wanted to relocate to a building in the Village of Hazel Crest, a town of some 15,000 people located two miles north and slightly west of Chicago Heights. The building, however, is in a part of the town designated by the town's zoning ordinance as a commercial district. The district is in the town's oldest part, which is run down; indeed the entire town has been in economic decline for years. The area designated as a commercial district is close to the train station, and the presence of commuters might enable the district to be revitalized as a commercial center. The zoning ordinance has therefore been amended to exclude new noncommercial uses from the district, including not only churches but also community centers, schools, and art galleries.

River of Life sued the Village under the equal-terms provision and moved for a preliminary injunction against the enforcement of the zoning ordinance. The district judge denied the motion and a panel of this court affirmed, mainly on the ground that the church was unlikely to prevail when the case was fully litigated. 585 F.3d 364 (7th Cir. 2009). The existence of an intercircuit conflict with respect to the proper test for applying the

equal-terms provision, combined with uncertainty about the consistency of our decisions, persuaded the full court to hear the case in order to decide on a test.

Two of our sister courts of appeals have proposed tests. The Third Circuit in *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 266 (3d Cir. 2007), ruled that "a regulation will violate the Equal Terms provision only if it treats religious assemblies or institutions less well than secular assemblies or institutions that are similarly situated *as to the regulatory purpose*" (emphasis in original). The court must identify first the goals of the challenged zoning ordinance and second the secular assemblies (meeting places) that are comparable to the plaintiff's religious assembly in the sense of having roughly the same relation to those goals. If the reasons for excluding some category of secular assembly—whether traditional reasons such as effect on traffic or novel ones such as creating a "Street of Fun," see, e.g., Clifton Hill, "Fun by the Falls," www.cliftonhill.com (visited May 25, 2010)—are applicable to a religious assembly, the ordinance is deemed neutral and therefore not in violation of the equal-terms provision. But if a secular assembly is allowed and the religious assembly banned even though the two assemblies don't differ in any way material to the regulatory purpose behind the ordinance, then neutrality has been violated and equality denied. That was the situation in the *Lighthouse* case. The zoning ordinance permitted meeting halls in the district in which the church wanted to locate and there was no way to distinguish between meeting halls and churches on the basis of the purpose of the ordinance. The Third

Circuit therefore ordered summary judgment in favor of the church with respect to its challenge to the ordinance (though not its challenge to a newer redevelopment plan), saying that "Long Branch [the defendant] has failed to create a genuine issue of material fact as to whether the Ordinance treated religious assemblies or institutions on less than equal terms with non-religious assemblies or institutions that caused equivalent harm to its governmental objectives." 510 F.3d at 272-73.

An alternative test was adopted by the Eleventh Circuit in *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1230-31 (11th Cir. 2004), and followed in *Prima Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295, 1308-10 (11th Cir. 2006), and *Konikov v. Orange County*, 410 F.3d 1317, 1324-29 (11th Cir. 2005) (per curiam). The Eleventh Circuit reads the language of the equal-terms provision literally: a zoning ordinance that permits *any* "assembly," as defined by dictionaries, to locate in a district must permit a church to locate there as well even if the only secular assemblies permitted are hospital operating theaters, bus terminals, air raid shelters, restaurants that have private dining rooms in which a book club or professional association might meet, and sports stadiums. In *Midrash* the court held that where private clubs are allowed, so must churches be.

Pressed too hard, this approach would give religious land uses favored treatment—imagine a zoning ordinance that permits private clubs but not meeting halls used by political advocacy groups. The court indicated, however, that a seemingly unequal treatment of religious uses that

nevertheless is consistent with the "strict scrutiny" standard for determining the propriety of a regulation affecting religion would not violate the equal-terms provision. *Midrash Sephardi, Inc. v. Town of Surfside*, *supra*, 366 F.3d at 1232.

Our own cases dealing with that provision had cited *Midrash* without criticism but had not been centrally concerned with the interpretive issue presented in this case. In *Digrugilliers v. Consolidated City of Indianapolis*, 506 F.3d 612, 616-17 (7th Cir. 2007), the issue was whether by granting churches rights that, though unlikely to be exercised, would conflict with rational zoning policy, a municipality could exclude churches from a district in which otherwise similar secular assemblies were permitted; we held it could not. In *Vision Church v. Village of Long Grove*, 468 F.3d 975, 1002-03 (7th Cir. 2006), which we decided against the church plaintiff, the restaurants and health clubs that the church considered comparable land users that were treated more favorably than it was were located in a commercial district rather than in the residential district in which the church sought to build, and "the fact that [the church] and the elementary schools [which the church also contended were comparable, and which were permitted under a prior city ordinance but would have been excluded under the current ordinance] were subject to different standards because of the year in which their special use applications were considered compels the conclusion that there was no unequal treatment." *Id*. at 1003.

Neither the Third Circuit's nor the Eleventh Circuit's approach, though in application they might yield similar or even identical results—and results moreover that would strike most judges as proper—is entirely satisfactory. We are troubled by the Eleventh Circuit's rule that mere "differential treatment" between a church and some other "company of persons collected together in one place . . . usually for some common purpose" (the court's preferred dictionary definition of "assembly") violates the equal-terms provision. *Midrash Sephardi, Inc. v. Town of Surfside, supra*, 366 F.3d at 1230-31. "Assembly" so understood would include most secular land uses—factories, nightclubs, zoos, parks, malls, soup kitchens, and bowling alleys, to name but a few (visitors to each of these institutions have a "common purpose" in visiting)—even though most of them have different effects on the municipality and its residents from a church; consider just the difference in municipal services required by different land uses, including differences in the amount of police protection. The land use that led the Eleventh Circuit in *Midrash* to find a violation of the equal-terms provision was, however, a private club, and it is not obvious that it has different effects on a municipality or its residents from those of a church. Thus our quarrel is not with the result in *Midrash* but with the Eleventh Circuit's test.

A subtler objection to the test is that it may be *too* friendly to religious land uses, unduly limiting municipal regulation and maybe even violating the First Amendment's prohibition against establishment of religion by discriminating in favor of religious land uses.

See *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 900 (7th Cir. 2005). The Supreme Court had held in *Employment Division v. Smith*, 494 U.S. 872, 878-80 (1990), that the clause of the First Amendment that guarantees the free exercise of religion does not excuse churches from having to comply with nondiscriminatory regulations, such as the prohibition of drugs believed to be dangerous, even if the regulation interferes with church rituals or observances: "we have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Id*. at 878-79. If they were excused, this might be deemed favoritism to religion and thus violate the establishment clause.

Suppose a zoning ordinance forbids all assemblies except gymnasiums. Then because a gymnasium is an assembly as defined by the Eleventh Circuit, a church could locate in the district but a secular humanist reading room could not, unless secular humanist organizations (such as American Atheists, the American Humanist Association, the Freedom From Religion Foundation, the Godless Americans Political Action Committee, Internet Infidels, and the Skeptics Society—these are all real organizations) were defined as religions. (Nor could the local chapter of the Cat Fanciers' Association, which might have 67 dues-paying local members, only about half of whom show up on average at the chapter's meetings.) It was to avoid making its test overprotect religious assembles in comparison to their closest secular counterparts that the Eleventh Circuit added its "strict

scrutiny" gloss—municipalities can bar religious land uses from particular zones if the regulation satisfies the "strict scrutiny" test for regulations that treat religious and secular activities differently. There is no textual basis for the gloss, and religious discrimination is expressly prohibited elsewhere in the statute. The gloss was needed only to solve a problem of the court's own creation.

A further objection to the Eleventh Circuit's test is that "equality," except when used of mathematical or scientific relations, signifies not equivalence or identity but proper relation to relevant concerns. It would not promote equality to require that all men wear shirts that have 15-inch collars, or that the number of churches in a state equal the number of casinos, or that all workers should have the same wages. But it does promote equality to require equal pay for equal work, even though workers differ in a variety of respects, such as race and sex. If a church and a community center, though different in many respects, do not differ with respect to any accepted zoning criterion, then an ordinance that allows one and forbids the other denies equality and violates the equal-terms provision.

This understanding of the equal-terms provision is imperfectly realized by the Third Circuit's test as well. That test centers on identifying the zoning authorities' "regulatory purpose" in adopting an ordinance that excludes a church. Our concern is not that the equal-terms provision as drafted by Congress omits the term "regulatory purpose" or some cognate term. As we explained,

"equality" is a complex concept. The fact that two land uses share a dictionary definition doesn't make them "equal" within the meaning of a statute. But the use of "regulatory purpose" as a guide to interpretation invites speculation concerning the reason behind exclusion of churches; invites self-serving testimony by zoning officials and hired expert witnesses; facilitates zoning classifications thinly disguised as neutral but actually systematically unfavorable to churches (as by favoring public reading rooms over other forms of non-profit assembly); and makes the meaning of "equal terms" in a federal statute depend on the intentions of local government officials. *Midrash Sephardi, Inc. v. Town of Surfside*, *supra*, 366 F.3d at 1231.

That was our point in *Digrugilliers v. Consolidated City of Indianapolis*, *supra*, 506 F.3d at 615, when we rejected the argument that a city "could exclude churches from districts zoned residential by ordaining that a residential use of land does not include the grazing of sheep but a religious use does, and therefore the federal Act does not require the City to permit churches in residential zones, as to do so would give churches more rights than the other users of land in those zones have. Such an approach—in effect defining 'religious assembly or institution' as a church plus a sheep farm—would be bootstrapping."

The problems that we have identified with the Third Circuit's test can be solved by a shift of focus from regulatory *purpose* to accepted zoning *criteria*. The shift is not merely semantic. "Purpose" is subjective and manipulable,

so asking about "regulatory purpose" might result in giving local officials a free hand in answering the question "equal with respect to what?" "Regulatory criteria" are objective—and it is federal judges who will apply the criteria to resolve the issue.

So let us consider those criteria, noting by way of background that originally zoning was "cumulative"—that is, "higher uses," such as residential land uses, were permitted in districts in which "lower uses," such as manufacturing, were permitted, though the "lower uses" were excluded from districts zoned for the higher ones. Cumulative zoning soon gave way to noncumulative (or "exclusive") zoning, in which specified land uses were confined to specified districts and thus could be and often were separated. See, e.g., *State ex rel. Berndt v. Iten*, 106 N.W.2d 366, 368-69 (Minn. 1960); *McDonough v. Apton*, 368 N.Y.S.2d 603, 608-09 (N.Y. App. Div. 1975); *Grubel v. MacLaughlin*, 286 F. Supp. 24, 28-29 (D.V.I. 1968); Daniel R. Mandelker, *Land Use Law* § 5.43 (5th ed. 2003). As explained in *People ex rel. Skokie Town House Builders, Inc. v. Village of Morton Grove*, 157 N.E.2d 33, 36 (Ill. 1959), "the dangers of heavy traffic are greater in mixed residential-industrial or residential-commercial districts than in districts devoted to just one purpose. Industrial and commercial districts are not good places to bring up families from a health standpoint; and the presence of children in and about industrial and commercial districts leads to a demand for school, park and play-ground facilities in an area where there is either no land available or the land available is ill-suited to such uses. In short, whether industry and commerce are excluded

from the residential areas, or residences from industrial and commercial areas, it is not unreasonable for a legislative body to assume that separation of the areas would tend in the long run to insure a better and a more economical use of municipal services, such as schools, providing police protection, preventing and fighting fires, and better use of street facilities. The general welfare of the public may be enhanced if industry and commerce are provided with a favorable climate. The sale of a few lots at important points in a district may make industrial or commercial expansion impossible or prohibitively expensive. To protect the residents in the district, traffic may be slowed down unduly and thus detract from the efficiency of production and trade. In final analysis, it seems clear that industry and commerce are also necessary and desirable and that a proper environment for them will promote the general welfare of the public."

Or as Patricia E. Salkin, *American Law of Zoning* § 9:15 (5th ed. 2010), explains with specific reference to commercial districts: "All commercial uses are not created equal. Some require pedestrian traffic; others create hazards for pedestrian traffic. Some commercial uses cause pedestrian traffic during the daylight hours; others operate at night and are quiet in the daytime. The list of characteristics could be extended, but this small sample suggests that residential uses in commercial neighborhoods will injure, as well as be injured by, the adjacent commercial uses. And it suggests further that some commercial uses will be incompatible with others . . . . The most common drafting answer to the problems sketched above is the 'exclusive'

zoning ordinance . . . . Districts are established for named uses, or groups of uses, and all others are excluded. The chief virtue of such ordinances is that they create districts for commerce and industry, and exclude from such districts residential and other uses which are capable of interfering with the planned use of land."

And in like vein we read in Harry B. Madsen, "Noncumulative Zoning in Illinois," 37 *Chi-Kent L. Rev.* 108, 113-14 (1960), that "if municipalities wish to retain their commercial and industrial tax plums they must compete with the advantages to be gained in the wide open spaces where the car-pools flow freely. Commerce and industry must be recognized for what they are, necessary and desirable elements of the community . . . . [M]uch of the exodus of commerce and industry would be checked by reasonable security that an already bad situation would not get worse. The noncumulative zoning ordinance is peculiarly well suited to provide this security."

Exclusion of churches from a commercial zone (though generally not from every commercial zone in the municipality), along with other noncommercial assemblies, such as exhibition halls, clubs, and homeless shelters, is thus not unique to the Village of Hazel Crest. See, e.g., Fairfield, California Municipal Code, art. I, § 25.22.2(A), tab. 25-9, www.codepublishing. com/ca/fairfield/html/fairfield25/fairfield2522.html; Village of Lincolnwood, Illinois Zoning Code tab. 4.01.1, www.ecode360.com/documents/LI3005/Chapter%2016%20-%20Zoning%20Ordinance.pdf; Skokie, Illinois Zoning Ordinance, ch. 118, App. A, library.municode.com/HTML/13819/level2/C118_AA.html;

North Beach, Maryland Zoning Ordinance, art. III, § 3-200 tab. 1, www.ci.north-beach.md.us/Pages/ NorthBeachMD_ Zoning/zoning/article3.pdf (all visited May 25, 2010).

A reader might worry that "commercial" is a synonym for "secular." It is not. There are many secular noncommercial land uses, and if the Village of Hazel Crest were concerned for example about the sufficiency of parking space in some part of the village, the commercial or noncommercial character of land uses that generated similar vehicular traffic flows would be irrelevant. Suppose maintenance of regular (as opposed to sporadic and concentrated) vehicular traffic were the zoning objective. From that standpoint, a church is more like a movie theater, which also generates groups of people coming and going at the same time, than like a public library, which generates a smoother flow of traffic throughout the day. The equal-terms provision would therefore require the zoning authorities to allow the church in the zone with the movie theater because the church was more like the for-profit use (the movie theater) than the not-for-profit use (the public library).

Parking space and traffic control are not the only concerns of land-use regulation. Another is generating municipal revenue and providing ample and convenient shopping for residents, and can be promoted by setting aside some land for commercial uses only, which generate tax revenues. Hazel Crest has therefore created a commercial district that excludes churches *along with* community centers, meeting halls, and libraries because these secular assemblies, like churches, do not generate signifi-

cant taxable revenue or offer shopping opportunities. See Robert C. Ellickson & Vicki L. Been, *Land Use Controls: Cases and Materials* 90-91 (3d ed. 2005). Similar assemblies are being treated the same. The permitted land use that is most like the plaintiff's is a commercial gymnasium, and that's not close enough because a commercial assembly belongs in an all-commercial district and a noncommercial assembly, secular or religious, does not.

Of course we can't be certain, or even confident, that a particular zoning decision was actually motivated by a land-use concern that is neutral from the standpoint of religion. But if religious and secular land uses that are treated the same (such as the noncommercial religious and secular land uses in the zoning district that River of Life wants to have its church in) from the standpoint of an accepted zoning criterion, such as "commercial district," or "residential district," or "industrial district," that is enough to rebut an equal-terms claim and thus, in this case, to show that River of Life is unlikely to prevail in a full litigation. (Another section of the ordinance—section 8.1(c), which provides that "no church services may be conducted in any building designed for a business use"—appears not to be at issue.)

Indeed, this case is straightforward because, after the amendment to its zoning ordinance, Hazel Crest really was applying conventional criteria for commercial zoning in banning noncommercial land uses from a part of the village suitable for a commercial district because of proximity to the train station. We are likely to have cases in the future challenging zoning ordinances that are harder

to classify, as variances and special-use permits and grandfathered nonconforming uses blur the character of particular zoning districts. But should a municipality create what purports to be a pure commercial district and then allow other uses, a church would have an easy victory if the municipality kept it out.

If the test we are adopting seems less than airtight, bear in mind that the equal-terms provision is not the only or even the most important protection against religious discrimination by zoning authorities. (Think of the religious clauses of the First Amendment.) It is not even the only protection in the Religious Land Use and Institutionalized Persons Act. For the Act provides that a land-use regulation "that imposes a substantial burden on the religious exercise of a . . . religious assembly or institution" is unlawful "unless the government demonstrates that imposition of the burden . . . is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1); see *World Outreach Conference Center v. City of Chicago*, 591 F.3d 531, 537-38 (7th Cir. 2009); *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, *supra*, 396 F.3d at 901; *Westchester Day School v. Village of Mamaroneck*, 504 F.3d 338, 352-53 (2d Cir. 2007). And it further provides that "no government shall impose or implement a land use regulation in a manner that discriminates against any assembly or institution on the basis of religion or religious denomination," § 2000cc(b)(2); see *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533-37 (1993); *Bloch v. Frischholz*, 587 F.3d 771, 783-87 (7th Cir.

2009) (en banc), or that "totally excludes religious assemblies from a jurisdiction." § 2000cc(b)(3)(A). But as none of these other provisions is before us on this appeal, the appeal must fail.

AFFIRMED.

CUDAHY, *Circuit Judge*, with whom ROVNER, *Circuit Judge*, joins, concurring. I join the majority opinion, as well as the concurrence of Judge Williams, but offer these comments with respect to the relation of the proposed test to the Third Circuit test, which is simpler—if arguably more subjective. As a general matter, the equal-terms provision seems to be a somewhat mysterious and unprecedented device for providing an anti-discrimination requirement, without incorporating the usual limiting characteristics of "discrimination" as a traditional concept. Although Congress may have intended to prescribe a standard more open-ended than traditional "discrimination," its application, as a practical matter, requires, for reasons suggested by the majority, some limitations to be provided by the judiciary. The Third Circuit's requisite of "regulatory purpose" may be imperfect, but I think it is acceptable in the vast majority of cases and that this test is generally appropriate. Although the majority opinion does provide insights that are important and helpful, I see little real contrast in basic approach or result be-

tween the Third Circuit and the majority analysis and I would regard them both as equally valid. Ultimately, I suspect that the practical distinction between "regulatory purpose" and "regulatory criteria" may not be as pronounced as the majority opinion suggests. In the last analysis, the search by the different circuits for an entirely objective test is probably in vain.

MANION, *Circuit Judge*, concurring.

A.

This case is difficult not because of the facts, but because of the hypotheticals. I agree with the court that under the facts of this case, River of Life does not have a likelihood of success on the merits of its Equal Terms challenge. To be treated "on less than equal terms" a church must be "equal" to a non-religious assembly allowed under the zoning ordinance. At this point, River of Life Church is not equivalent to any of the allowable uses in Hazel Crest's commercial district.[1]

---

[1] For a while, River of Life had a strong argument that it was treated on "less than equal terms" to non-religious assemblies because Hazel Crest's zoning ordinance originally allowed

(continued...)

The challenge before our court is crafting a standard for analyzing all of the hypothetical Equal Terms cases yet to come. The difficulty in this task is highlighted by the fact that the court agrees with the outcomes of the Third and Eleventh Circuit decisions in this area, but finds neither circuit's approach entirely satisfactory (although the court also believes that, in application, the different standards might yield similar or even identical results). Opinion at 6. Judge Sykes in her dissent foresees other problems with this court's standard. While I disagree with Judge Sykes' conclusion that River of Life was treated "on less than equal terms" of other assemblies, her dissent persuasively identifies potential flaws with the court's standard, given the statutory text and historical and legislative background to the Religious

---

[1] (...continued)

meeting halls and community centers, which are likely comparable to a church under any standard of equivalency. But after this lawsuit was filed, Hazel Crest amended its ordinance and deleted those comparable uses. Deleting meeting halls and community centers from the commercial zone likely did not cause Hazel Crest much concern because it does not appear that there were any developers jumping at the chance to invest in such gathering places. In fact, at this stage Hazel Crest's revitalization plan is still in the hypothetical stage; at the time of the original briefing in this case, Hazel Crest was eight years into its revitalization plan and yet no new businesses had located in the commercial district. The best thing for Hazel Crest might well have been for River of Life to take over the abandoned car wash, but the Village decided otherwise.

Land Use and Institutionalized Persons Act. Even the court acknowledges that the test is not "air tight" and that future zoning cases will be harder to classify. Opinion at 14-15. Given that the facts of this case do not lay a solid foundation for crafting a universally governing standard, it might be more prudent to resolve the straight-forward case before us rather than speculating on how to resolve a more difficult question in a future case.

B.

More discomforting is the court's observation that if religious beliefs excused an individual from compliance with otherwise valid regulations, "this might be deemed favoritism to religion and thus violate the establishment clause," and the court's further statement that "[a] subtler objection to the [Eleventh Circuit] test is that it may be *too* friendly to religious land uses, unduly limiting municipal regulation and maybe even violating the First Amendment's prohibition against establishment of religion by discriminating in favor of religious land uses." Opinion at 6. Only dicta supports this statement. *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 900 (7th Cir. 2005). In turn, *Sts. Constantine* cites dicta from *Westchester Day Sch. v. Village of Mamaroneck*, 386 F.3d 183, 189-90 (2d Cir. 2004). And *Westchester Day*'s dicta relies solely on Justice Stevens concurrence in *City of Boerne v. Flores,* 521 U.S. 507, 537 (1997) (Stevens, J., concurring). Another Supreme Court concurrence, however, supports the view that the government may grant exemptions to religious observers without violating the Establishment Clause. *Wallace v.*

*Jaffree*, 472 U.S. 38, 82 (1985) (O'Connor, J., concurring) ("Even where the Free Exercise Clause does not compel the government to grant an exemption, the Court has suggested that the government in some circumstances may voluntarily choose to exempt religious observers without violating the Establishment Clause. *See, e.g., Gillette v. United States,* 401 U.S. 437, 453, 91 S.Ct. 828, 838, 28 L.Ed.2d 168 (1971); *Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961)."). Because there is no need to delve into this complicated question (and one which was not briefed) to resolve the case at hand, we should not imply that religious exemptions violate the Establishment Clause.

For these reasons, I concur.

WILLIAMS, *Circuit Judge*, with whom CUDAHY and ROVNER, *Circuit Judges*, join, concurring. I join the majority in reaffirming that River of Life is not entitled to a preliminary injunction, and I also join Judge Cudahy's concurrence. I write separately to reiterate my belief that the Third Circuit's "regulatory purpose" test adopted by the original panel is the most appropriate application of the equal-terms provision.

The original panel applied the Third Circuit's approach from *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253 (3d Cir. 2007), reasoning that

differentiation between religious and non-religious as-
semblies under a zoning ordinance was insufficient to
establish an equal-terms violation unless the assemblies
had a comparable effect on the village's regulatory pur-
pose. Thus, the question was simply whether the dif-
ferent treatment of a religious assembly and a non-reli-
gious assembly was consistent with the zoning ordinance's
regulatory purpose. Here, the village's regulatory
purpose in establishing the commercial zone was to
create a tax revenue-generating commercial district
centered near the mass transit area; because the church
was not similar to the non-religious entities permitted
in the zone—all of which were commercial in nature—the
panel found that the church had not been treated on
less than equal terms with the commercial non-religious
entities.

I have great respect for the majority's attempt to carve
out a compromise between the Eleventh Circuit's ap-
proach and that of the Third Circuit and original panel.
However, I still think the "regulatory purpose" test is the
best approach. The "regulatory purpose" test is simpler
and does not require federal judges to determine which
zoning districts fit within "accepted regulatory criteria"—
and indeed, what those accepted criteria are in the first
place. (Moreover, the majority's opinion is unclear as to
how a judge should proceed with its equal-terms analysis
when presented with a unique, non-traditional zoning
scheme.) Second, to the extent that traditional zoning
classifications are important, a judge assessing a reg-
ulatory purpose already uses them as guidance. Finally,
the majority's approach does not solve the problem it

perceives in the Third Circuit's approach. Zoning officials could just as easily use accepted criteria as a pretext for action as they could articulate a regulatory purpose. The "accepted regulatory criteria" test therefore presents a risk of self-serving testimony just as the majority believes the "regulatory purpose" approach would.

SYKES, *Circuit Judge*, dissenting. This is an important religious-liberty case. We took it en banc to decide a key question of statutory interpretation involving § 2(b)(1) of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc(b)(1)—the statute's "equal terms" provision—and to resolve a conflict the panel opinion created in our caselaw.

The circuits are divided over how to read this part of RLUIPA. Until this case we had followed the Eleventh Circuit's interpretation of the equal-terms provision, first announced in *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214 (11th Cir. 2004), and explained in *Konikov v. Orange County*, 410 F.3d 1317 (11th Cir. 2005), and *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295 (11th Cir. 2006). *See Digrugilliers v. Consolidated City of Indianapolis*, 506 F.3d 612, 616 (7th Cir. 2007); *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1003 (7th Cir. 2006). The en banc court now prefers the Third Circuit's approach, announced in *Light-*

*house Institute for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253 (3d Cir. 2007), though in a slightly modified form. This interpretation departs from the text, structure, and history of RLUIPA, and the conflict in our circuit caselaw remains. With respect, I cannot join the court's opinion. We were right in *Vision Church* and *Digrugilliers* to follow the Eleventh Circuit's lead; I would build on that start, with some elaboration.

## I.

The equal-terms provision of RLUIPA is straightforward. It prohibits governments from imposing or implementing land-use regulations "in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). River of Life Kingdom Ministries is a small evangelical Christian church with a community-based mission aimed at uplifting the disadvantaged. The church bought a building in the Village of Hazel Crest, Illinois, and sought to move from a rented warehouse in Chicago Heights to its new location in Hazel Crest. The property formerly housed a car wash and is in a struggling part of town known as "Hazel Crest Proper," which was zoned as a "B-2 Service Business District" under the Village's then-existing zoning ordinance. A wide variety of commercial and retail uses were permitted in this zone but not churches.

More specifically, the Hazel Crest zoning ordinance authorized "[a]ll general commercial and retail uses" in the B-2 District and also enumerated the following

specific permitted uses: art galleries; automobile service stations; dry-cleaning establishments and laundries; funeral parlors; gymnasiums, health clubs, and salons; hotels and motels; laboratories; medical and dental clinics; meeting halls; newspaper offices; business, professional, and public offices; resale or secondhand stores; restaurants; taverns or cocktail lounges; and accessory uses to the foregoing permitted uses. In addition, the ordinance authorized certain "special uses" (by permit) in the B-2 District: art galleries and museums; day-care centers; schools of any kind; public libraries; parking lots and storage garages; a variety of utility and public-agency buildings; recreational buildings and community centers; and taverns, cocktail lounges, and restaurants featuring live entertainment. The ordinance also specifically prohibited church services from being held in any "business use" building; this restriction was applicable in all business districts in the village, including the B-2 District.

River of Life applied for a special-use permit to allow it to move its church from Chicago Heights to its property in Hazel Crest Proper, but this application was denied. The church then sued Hazel Crest alleging a RLUIPA equal-terms violation (among other statutory and constitutional claims) and moved for a preliminary injunction. In the meantime the Village amended its zoning ordinance in an apparent effort to cure the rather obvious

facial violation of RLUIPA's equal-terms provision.[1] The amended ordinance removed certain secular assemblies from the list of permitted and special uses authorized in the B-2 District—meeting halls, art galleries, museums, schools, libraries, recreational buildings, community centers, and certain other secular assembly uses—but continued to expressly permit commercial gymnasiums, health clubs, and salons; hotels and motels; restaurants and taverns; and day-care centers (as an allowed "special use"). River of Life maintains that these remaining permitted uses are "nonreligious assemblies" within the meaning of § 2(b)(1) of RLUIPA, and that allowing these uses in the B-2 District while excluding churches like River of Life treats religious assemblies on "less than equal terms" than "a nonreligious assembly or institution" in violation of RLUIPA.

The district court denied River of Life's motion for a preliminary injunction. Relying on our decisions in *Vision Church* and *Digrugilliers*, the court followed the Eleventh Circuit's interpretation of § 2(b)(1) and concluded that River of Life had a "slight likelihood of success on the merits." But the court also held that this "slight likelihood" was not enough to tip the balance of harms in the church's favor. River of Life appealed. A panel of this court abandoned the Eleventh Circuit's interpretation of the equal-terms provision—previously approved in *Vision Church* and *Digrugilliers*—and instead adopted that of the

---

[1] The Village amended the ordinance after River of Life sued and while the motion for a preliminary injunction was pending before the district court.

Third Circuit in *Lighthouse Institute.* We ordered rehearing en banc to address this shift in circuit caselaw and because the interpretation of the equal-terms provision is an important and recurring legal issue that has divided the circuits and warranted the attention of the full court.

## II.

### A.

The equal-terms provision is best understood not in isolation but in the context of RLUIPA's other protections for religious land uses and against the backdrop of the decade-long tug of war between Congress and the Supreme Court over the protection of religious liberty. *See Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005) ("RLUIPA is the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens, consistent with this Court's precedents."). RLUIPA was enacted in the wake of *City of Boerne v. Flores*, which invalidated the broader Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.*, as exceeding Congress's authority under § 5 of the Fourteenth Amendment to enforce the limits on state power imposed by § 1 of the Amendment. 521 U.S. 507, 532-36 (1997); *see also Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 897-98 (7th Cir. 2005). RFRA, in turn, had been adopted in response to the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990), which altered the prevailing strict-

scrutiny standard of *Sherbert v. Verner*, 374 U.S. 398 (1963), applicable to laws that substantially burden the First Amendment right to the free exercise of religion. *See City of Boerne*, 521 U.S. at 512 ("Congress enacted RFRA in direct response to the Court's decision in *Employment Div., Dept. of Human Resources of Oregon v. Smith*." (citation omitted)).

*Smith* held that facially neutral and generally applicable laws that burden free-exercise rights need not satisfy a heightened standard of review—neither the compelling-interest standard of *Sherbert* nor any more rigorous form of review than the test for basic rationality that is applicable to all laws. 494 U.S. at 878-79. Three years later, the Court clarified that "[f]acial neutrality [alone] is not determinative. . . . Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). Without retreating from *Smith*, the Court held in *Lukumi* that a facially neutral, generally applicable law is subject to strict scrutiny if it amounts to a "religious gerrymander" or is enforced in a way that discriminates against religion or targets a particular religious group or practice for discriminatory treatment. *Id.* at 535-47; *see also Bloch v. Frischholz*, 587 F.3d 771, 785-87 (7th Cir. 2009) (en banc). Of course it remains true that "the minimum requirement of [free-exercise] neutrality is that a law not discriminate on its face." *Lukumi*, 508 U.S. at 533. Finally, the Court reiterated in *Lukumi* that a law permitting "'individualized governmental assessment of the reasons for the relevant

conduct' " is not considered "generally applicable." *Id.* at 537 (quoting *Smith*, 494 U.S. at 884). In a regulatory system where exemptions from otherwise applicable rules are permitted, denying a religious-exercise exemption requires a compelling justification. *Id.*

While the *Lukumi* case was making its way to the Supreme Court, Congress was considering legislation in response to the Court's decision in *Smith*; RFRA was enacted soon after the Court's decision in *Lukumi* was announced. RFRA restored the compelling-interest standard of *Sherbert* and applied broadly to all governmental actions that substantially burdened free-exercise rights. *See City of Boerne*, 521 U.S. at 515-16. In *City of Boerne*, however, the Supreme Court invalidated the new statute as exceeding Congress's § 5 enforcement power. The Court drew a distinction between laws that remedy or prevent constitutional violations and laws that attempt to "determine what constitutes a constitutional violation." *Id.* at 519. Only the former are valid uses of the § 5 enforcement power. *Id.* Laws enacted under § 5, the Court said, require "a congruence and proportionality between the [constitutional] injury to be prevented or remedied and the means adopted to that end." *Id.* at 520. Based on the sheer breadth of the statute as well as the inadequacy of the legislative record supporting it, the Court concluded that "RFRA is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior. It appears, instead, to attempt a substantive change in constitutional protections." *Id.* at 532.

So Congress went back to the drawing board, narrowed its focus, and began compiling a legislative record of free-exercise violations in two discrete areas: laws affecting land use by religious organizations and laws affecting the religious exercise of institutionalized persons. RLUIPA was the result of this effort and was adopted in 2000, three years after the Court decided *City of Boerne*.[2] For more on this history, see generally, Sarah Keeton Campbell, Note, *Restoring RLUIPA's Equal Terms Provision*, 58 DUKE L. J. 1071, 1076-85 (2009); Patricia E. Salkin & Amy Lavine, *The Genesis of RLUIPA and Federalism: Evaluating the Creation of a Federal Statutory Right and Its Impact on Local Government*, 40 URB. LAW. 195, 205-08 (2008); Roman P. Storzer & Anthony R. Picarello, Jr., *The Religious Land Use and Institutionalized Persons Act of 2000: A Constitutional Response to Unconstitutional Zoning Practices*, 9 GEO. MASON L. REV. 929, 931-44 (2001); Douglas Laycock, *State RFRAs and Land Use Regulation*, 32 U.C. DAVIS L. REV. 755, 770-82 (1999).

## B.

RLUIPA stipulates that the use of real property for religious purposes is a form of "religious exercise," *see* 42 U.S.C. § 2000cc-5(7)(B) ("[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or

---

[2] RLUIPA's land-use provision is found in § 2 of the Act, codified at 42 U.S.C. § 2000cc; its institutionalized-persons provision is in § 3, codified at 42 U.S.C. § 2000cc-1.

entity that uses or intends to use the property for that purpose"), and codifies several strands of First Amendment free-exercise jurisprudence. *See World Outreach Conference Ctr. v. United States*, 591 F.3d 531, 533-35 (7th Cir. 2009); *see also* 146 CONG. REC. S7774-S7775 (joint statement of Sen. Hatch and Sen. Kennedy) ("The right to build, buy, or rent [in] a [physical] space is an indispensable adjunct of the core First Amendment right to assemble for religious purposes. . . . Each [of RLUIPA's land-use] subsection[s] closely tracks the legal standards in one or more Supreme Court opinions, codifying those standards for greater visibility and easier enforceability.").

More specifically, RLUIPA's land-use provision recognizes that land-use regulation can interfere with religious-exercise rights in a variety of ways and creates statutory remedies for several different kinds of free-exercise wrongs:

### § 2000cc. Protection of land use as religious exercise

#### (a) Substantial burdens

##### (1) General rule

No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—

(A) is in furtherance of a compelling governmental interest; and

**(B)** is the least restrictive means of furthering that compelling governmental interest.

. . . .

**(b) Discrimination and exclusion**

*(1) Equal terms*

*No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.*

**(2) Nondiscrimination**

No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.

**(3) Exclusion and limits**

No government shall impose or implement a land use regulation that—

**(A)** totally excludes religious assemblies from a jurisdiction; or

**(B)** unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

42 U.S.C. § 2000cc (emphasis added).

Subsection (a) of § 2000cc—the "substantial burdens" prohibition—enforces the Free Exercise Clause right to be free from state action that substantially interferes with the practice of religion without compelling justification. This provision codifies the *Sherbert* standard to the extent

permitted by *Smith* and *Lukumi*. That is, where a land-use regime permits individualized exemptions from regulatory restrictions—and almost all of them do—the government must have a compelling justification for denying an exemption from a restriction that substantially burdens the exercise of religion. Stated differently, a government "'that has a system for granting individual exemptions from a general [land-use] rule must have a compelling reason to deny a religious group an exemption that is sought on the basis of hardship or, in the language of the . . . Act, of a substantial burden on . . . religious exercise.'[3]" *World Outreach*, 591 F.3d at 534

[3] The reference to a "system" of land-use regulation that provides for "individual exemptions" incorporates the proviso contained in 42 U.S.C. § 2000cc(a)(2)(C), which states:

> This subsection applies in any case in which . . . the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.

This qualifier limits the scope of RLUIPA's "substantial burdens" subsection and derives from *Smith*. 494 U.S. at 884; *see also Lukumi*, 508 U.S. at 537 ("As we noted in *Smith*, in circumstances in which individualized exemptions from a general requirement are available, the government may not refuse to extend that system to cases of 'religious hardship' without compelling reason." (internal quotation marks omitted)). Its presence in § 2(a) of RLUIPA keeps this part of the statute in line with the Supreme Court's free-exercise jurisprudence

(continued...)

(quoting *City of New Berlin*, 396 F.3d at 897) (internal quotation marks omitted).

Subsection (b) of § 2000cc enforces the Free Exercise Clause right to be free from state action that discriminates on the basis of religion or religious practice, or discriminates among or between religions. The remedies provided in subsection (b) do not require proof that the challenged state action amounts to a "substantial burden" on religious exercise. This subsection is divided into three parts. Subsection (b)(1) is the equal-terms provision, at issue here. It codifies a particular kind of equality principle: No land-use regulation may treat "a religious assembly or institution" on "less than equal terms" than "a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). Subsection (b)(2) states a more general antidiscrimination rule; it prohibits the imposition or implementation of a land-use regulation that "discriminates against an assembly or institution on the basis of religion or religious denomination." *Id.* § 2000cc(b)(2). Subsection (b)(3) prohibits land-use regulations that operate to "totally exclude" a religious assembly from

---

³ (...continued)
and sustains Congress's use of its § 5 power. *World Outreach Conference Ctr. v. United States*, 591 F.3d 531, 534 (7th Cir. 2009). RLUIPA also expressly invokes the Spending and Commerce Clause powers—the latter through the device of a jurisdictional element requiring that the burden in question affect interstate commerce. *See id.* at 533-34; 42 U.S.C. § 2000cc(a)(2)(A), (B). We have not had occasion to consider the constitutionality of § 2(b) of RLUIPA; Hazel Crest does not challenge its constitutionality in this case.

a jurisdiction or "unreasonably limit" a religious assembly, institution, or structure within a jurisdiction. *Id.* § 2000cc(b)(3)(A), (B).

There is some obvious overlap in these statutory provisions. A land-use regulation that "totally excludes" a religious assembly from a jurisdiction in violation of subsection (b)(3) will also likely be a "substantial burden" on the religious assembly in violation of subsection (a)(1). A "substantial burden" on a religious assembly might also be discriminatory in violation of subsection (b)(2). But each of RLUIPA's land-use subsections captures a distinct kind of free-exercise harm and must be given its own force and effect. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) ("Redundancies across statutes are not unusual events in drafting, and so long as there is no positive repugnancy between two laws . . . , a court must give effect to both." (internal quotation marks and citation omitted)); *see also City of New Berlin*, 396 F.3d at 900; *Civil Liberties for Urban Believers v. City of Chicago*, 243 F.3d 752, 762 (7th Cir. 2003) (RLUIPA's land-use provisions are "operatively independent of one another.").

## C.

The equal-terms provision appears first in RLUIPA's list of remedies for "[d]iscrimination and exclusion" but is not phrased as a general antidiscrimination rule. RLUIPA has one of those; § 2000cc(b)(2) contains general antidiscrimination language prohibiting governments from imposing or implementing any land-use regulation

that "discriminates against any assembly or institution *on the basis of* religion or religious denomination." (Emphasis added.) The language of the equal-terms provision is different; it prohibits governments from imposing or implementing a land-use regulation "in a manner that *treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution*." 42 U.S.C. § 2000cc(b)(1) (emphasis added). This language is plain. To prove an equal-terms violation, a plaintiff "religious assembly or institution" need only establish that the challenged land-use regulation treats it on "less than equal terms with a nonreligious assembly or institution." There is no requirement that the challenged regulation (or the regulatory authority that adopted or enforced it) have a discriminatory purpose or motive or evince antireligious bias. This contrasts with the antidiscrimination provision contained in § 2000cc(b)(2), which targets regulations that discriminate "*on the basis of* religion." (Emphasis added.) Accordingly, a land-use regulation that on its face or in its operative effect or application treats a religious assembly or institution less well than a nonreligious assembly or institution will violate the equal-terms provision *even if* it was adopted or implemented for reasons unrelated to religious discrimination.

## III.

### A.

The Eleventh Circuit was the first to consider the scope of the equal-terms provision and has the most extensive

body of caselaw interpreting and applying this part of RLUIPA. In *Midrash Sephardi* the Eleventh Circuit held that although the equal-terms provision "has the 'feel' of an equal protection law, it lacks the 'similarly situated' requirement usually found in equal protection analysis." 366 F.3d at 1229. Accordingly, the court declined to import a "similarly situated comparator" requirement into RLUIPA equal-terms analysis. Instead, the court said, the equal-terms provision has a more "direct and narrow focus" and by its terms requires the court to evaluate whether the challenged land-use regulation treats a "religious assembly or institution" on "less than equal terms" than "a non-religious assembly or institu- tion." *Id.* at 1230. Because RLUIPA does not define "as- sembly" or "institution," the court consulted dictionary definitions and concluded that "a natural and ordinary understanding of 'assembly' [i]s a group gathered for a common purpose." *Id.* at 1231. The zoning ordinance at issue in *Midrash Sephardi* permitted private clubs and lodge halls in the municipality's business district but excluded churches and synagogues. Because private clubs and lodge halls were commonly understood as secular "assemblies" and were permitted in the zone while churches and synagogues were excluded, the *Midrash Sephardi* court concluded that the challenged ordinance facially violated the equal-terms provision. *Id.*

The court took the analysis a step further, however, and applied strict scrutiny to the statutory violation. "RLUIPA's equal terms provision codifies the *Smith-Lukumi* line of precedent," the court reasoned, so "a violation of § (b)'s equal treatment provision, consistent

with the analysis employed in *Lukumi*, must undergo strict scrutiny." *Id.* at 1232. The municipality's proffered justification for excluding churches and synagogues from the business district—the "interests of retail synergy"—flunked the compelling-interest test. *Id.* at 1235. The Eleventh Circuit completed its analysis in *Midrash Sephardi* by considering whether the equal-terms provision was a permissible use of Congress's § 5 enforcement power as understood in *City of Boerne*. The court concluded that it was, largely because the equal-terms provision codified the Supreme Court's Free Exercise Clause jurisprudence. *Id.* at 1236-40 (holding that § 2000cc(b)(1) reflects free-exercise jurisprudence and is consistent with existing Equal Protection and Establishment Clause caselaw).

In two subsequent cases, the Eleventh Circuit elaborated on *Midrash Sephardi* and adapted its analysis to "as applied" challenges under the equal-terms provision. *See Primera Iglesia*, 450 F.3d at 1307-08; *Konikov*, 410 F.3d at 1324-28. *Primera Iglesia*—the more recent of the two cases—offered this summary of the circuit's approach to RLUIPA equal-terms cases:

> Based on a review of our case law construing the Equal Terms provision and reviewing closely related Supreme Court precedent arising under the Free Exercise Clause of the First Amendment, we can discern at least three distinct kinds of Equal Terms statutory violations: (1) a statute that facially differentiates between religious and nonreligious assemblies or institutions; (2) a facially neutral statute that is nevertheless "gerrymandered" to place a burden

solely on religious, as opposed to nonreligious, assemblies or institutions; or (3) a truly neutral statute that is selectively enforced against religious, as opposed to nonreligious assemblies or institutions.

450 F.3d at 1308. In the first two types of claims, the equal-terms provision focuses on the content of the challenged land-use regulation to determine whether it expressly treats a religious assembly or institution on less than equal terms than a nonreligious assembly or institution, or was "gerrymandered" so that its unequal effect falls almost entirely on a religious assembly or institution, as in *Lukumi*. *Id.* at 1308-09. In an as-applied "selective enforcement" claim, however, the court held that an equal-terms plaintiff will generally be required to identify a similarly situated nonreligious assembly or institution that was treated more favorably. *Id.* at 1311; *Konikov*, 410 F.3d at 1327-29.

**B.**

We have cited *Midrash Sephardi*, *Konikov*, and *Primera Iglesia* with approval and specifically followed the Eleventh Circuit's approach in two prior cases. *See Digrugilliers*, 506 F.3d at 616; *Vision Church*, 468 F.3d at 1002-03. The claimant in *Vision Church* maintained (among other statutory and constitutional claims) that a special-use permit requirement in a local zoning ordinance violated RLUIPA's equal-terms provision. To resolve this claim, we relied on the Eleventh Circuit's decision in *Konikov,* noting first that as a general matter, there was no need to identify a "similarly situated" nonreligious

land use for comparison against the religious claimant. "'For purposes of a RLUIPA equal terms challenge, the standard for determining whether it is proper to compare a religious group to a nonreligious group is not whether one is "similarly situated" to the other, as in our familiar equal protection jurisprudence.'" *Vision Church*, 468 F.3d at 1002-03 (quoting *Konikov*, 410 F.3d at 1324). We looked instead to the text of the equal-terms provision to find the relevant comparison: "[T]he pertinent question is whether the 'land use regulation . . . treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.'" *Id.* at 1003. *Vision Church* then quoted at length from the passage in *Primera Iglesia* summarizing the three ways in which RLUIPA's equal-terms provision might be violated. *Id.* (quoting *Primera Iglesia*, 450 F.3d at 1308). Because the permit requirement at issue in *Vision Church* was facially neutral, did not "target religion through religious 'gerrymandering,'" and had not been selectively enforced against the claimant church, there was no equal-terms violation. *Id.*

*Digrugilliers* built on *Vision Church* and is very much like this case. In *Digrugilliers* a municipal zoning ordinance excluded churches from a commercial district but permitted a variety of other secular assemblies, including auditoriums, assembly halls, community centers, senior centers, day-care centers, art galleries, civic clubs, and libraries. 506 F.3d at 614-15. A Baptist minister sued, claiming an equal-terms violation, and like River of Life, moved for a preliminary injunction. The district court denied the motion and the minister appealed. Like the Village of Hazel Crest here, the municipality in *Digrugilliers*

argued that the exclusion of churches from the commercial district was justified because churches would inhibit commercial development within the zone. As additional support for this argument, the municipality noted that state law prohibited the sale of alcohol or pornography within 200 and 500 feet, respectively, of a church. We reversed, relying on *Vision Church* and the Eleventh Circuit's decisions in *Primera Iglesia* and *Midrash Sephardi*. *Id.* at 616. We focused not on the economic-development objectives of the municipality but on the ordinance's facial differentiation between religious and nonreligious assemblies, and dismissed the municipality's reliance on state laws protecting churches from incompatible adjacent land uses. We said: "Government cannot, by granting churches special privileges ( . . . the right of a church to be free from offensive land uses in its vicinity), furnish the reason for excluding churches from otherwise suitable districts." *Id.* We concluded in *Digrugilliers* that the minister's equal-terms claim had "at least some, and possibly great, merit," *id.* at 618, and remanded for application of the remaining preliminary-injunction criteria.

## C.

After our decisions in *Vision Church* and *Digrugilliers*, the Third Circuit weighed in on the equal-terms provision, disagreeing with the Eleventh Circuit and requiring *all* equal-terms plaintiffs to identify a similarly situated nonreligious assembly or institution for comparison; the "similarity" between the claimant and the comparator, moreover, was to be evaluated by reference to the "pur-

pose" of the regulation. More specifically, in *Lighthouse Institute* a divided Third Circuit panel held that "a [land use] regulation will violate the Equal Terms provision only if it treats religious assemblies or institutions less well than secular assemblies or institutions that are similarly situated *as to the regulatory purpose*." 510 F.3d at 266.

## IV.

### A.

My colleagues change course from our previous adherence to the Eleventh Circuit's interpretation of the equal-terms provision, though they do so while leaving *Digrugilliers* and *Vision Church* in place.[4] The en banc

---

[4] The court says *Digrugilliers* and *Vision Church* merely "cited *Midrash* without criticism but [were] not . . . centrally concerned with the interpretive issue presented in this case." Majority op. at 5. These opinions cannot be dismissed so easily. As I have explained, *Vision Church* and *Digrugilliers* invoked the Eleventh Circuit's interpretation with approval and specifically followed it; together, the opinions cite not just *Midrash Sephardi* but also *Konikov* and *Primera Iglesia.* It is true, as my colleagues have noted, that the decision in *Vision Church* went against the plaintiff church, but that does not make the opinion's analytical approach inapplicable here. *Digrugilliers* is contextually quite close to this case; the court's decision here cannot be reconciled with the decision in that case. Indeed, based on *Vision Church* (and to a lesser extent, *Digrugilliers*), the Third Circuit counts us as aligned with the Eleventh Circuit on

(continued...)

court adopts the Third Circuit's approach, albeit with a slight "shift of focus." Majority op. at 9. I think this is a mistake. The Third Circuit's interpretation departs from the text of the equal-terms provision and from the structure of RLUIPA's land-use provisions read as a whole. It conflates the specific protections contained in the equal-terms provision with the more general antidiscrimination rule contained in subsection (b)(2). On the Third Circuit's understanding, there is no difference in the two provisions. *See Corley v. United States*, 129 S. Ct. 1558, 1566 (2009) ("[O]ne of the most basic interpretive canons [is] that [a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (internal quotation marks omitted)).

Tellingly, the *Lighthouse Institute* majority did not try to make an argument for its interpretation from the text and structure of the statute. Instead, the court rested its holding on a reading of the Supreme Court's free-exercise caselaw—in particular, on *Smith* and *Lukumi*. 510 F.3d at 264-66. These cases, the court held, call for a narrow interpretation of the equal-terms provision, one that focuses on the negative effect of the religious land use on the zoning authority's objectives. The Third Circuit thus requires an equal-terms plaintiff to "show that it

---

[4] (...continued)

the interpretation of the equal-terms provision. *Lighthouse Institute,* 510 F.3d at 268, 271 & n.15. This case can only be understood as a repudiation of *Vision Church* and *Digrugilliers.*

was treated less well than a nonreligious comparator that had an equivalent negative impact on the aims of the land-use regulation." *Id.* at 270. My colleagues substitute "accepted zoning criteria" for regulatory "aims" or "purposes," majority op. at 9-10, but otherwise the test is the same. This minor shift in focus changes nothing of significance. The distinction between "accepted zoning criteria" and the "regulatory purpose" of exclusionary zoning is nonexistent or too subtle to make any difference in individual equal-terms cases. Zoning decisions are *always* tied to accepted land-use "criteria."

Regardless, under either formulation, the test dooms most, if not all, equal-terms claims. Zoning authorities will have little difficulty articulating their objectives in such a way as to prevent an excluded religious assembly from identifying a better-treated nonreligious comparator that has an equivalent negative effect on either the "purpose" or the "criteria" of the challenged land-use regulation. Routine "economic development" and "tax-enhancement" objectives—which can be characterized as "regulatory purposes" *or* "accepted zoning criteria"—will immunize the exclusion of religious land uses from commercial, business, and industrial districts because religious assemblies do not advance these objectives and for-profit secular assemblies do. Traffic control, density management, and noise-reduction objectives will tend to immunize the exclusion of religious land uses from residential districts because religious land uses may be inconsistent with these purposes or criteria in ways that secular assembly uses are not. Indeed, the municipality's very generic objectives in *Lighthouse Institute*—to create a "retail main street" and a

"modern entertainment-oriented district"—were sufficient to prevent the plaintiff church from meeting the Third Circuit's similarly situated test.[5] *Id.* at 270-71 (internal quotation marks omitted).

The *Lighthouse Institute* majority thought its reading of the equal-terms provision was required by *Smith* and

---

[5] My colleagues have omitted a key detail about the Third Circuit's application of its "similarly situated" test. *See* Majority op. at 3-4. In *Lighthouse Institute* (as in this case), the municipal defendant changed its zoning ordinance during the litigation, leaving the plaintiff church with a claim for injunctive relief against the new ordinance—referred to as "The Redevelopment Plan" or simply the "Plan"—and a very limited damages claim for the period between the church's "application for a waiver [from the terms of the old ordinance] and the enactment of the Plan." 510 F.3d at 273. The Third Circuit *rejected* the church's equal-terms claim against the new ordinance, ordering summary judgment for the municipal defendant because there was "no evidence" that "the Plan treats a religious assembly on less than equal terms with a secular assembly that would cause an equivalent negative impact on [the municipality's] regulatory goals." *Id.* at 272. True, the court *did* order summary judgment for the church on what was left of its claim against the old ordinance, but the remedy was necessarily quite limited: monetary damages for the time period leading up to the enactment of the new zoning plan. *Id.* The court did not say how these damages should be measured. The upshot of the *Lighthouse Institute* decision, read as a whole, is that the core of the church's equal-terms claim—which sought relief from the land-use regulatory scheme that was preventing it from locating in a downtown commercial district—failed.

*Lukumi*, but I disagree. There is no "similarly situated" requirement in the Supreme Court's *free-exercise* jurisprudence; neither *Smith* nor *Lukumi* suggests a need to graft such a requirement onto the equal-terms provision. As the Eleventh Circuit held in *Primera Iglesia* and we noted with approval in *Vision Church*, to the extent that RLUIPA's equal-terms provision parallels the Supreme Court's free-exercise jurisprudence, three kinds of violations are contemplated: (1) facial violations (land-use regulations that by their terms treat a religious assembly less well than a secular assembly); (2) religious gerrymanders (facially neutral regulations designed or constructed to affect only religious assemblies or a particular religious practice); and (3) as-applied violations (facially neutral regulations that are selectively enforced against religion or a particular religious practice).

This understanding is fully consistent with *Lukumi*, which—as we recently noted in our en banc decision in *Bloch*—held that *Smith*'s facial-neutrality-and-general-applicability standard is not necessarily the end-game inquiry in Free Exercise Clause cases. *Bloch*, 587 F.3d at 785-87. In some cases it might be; a law that is *not* facially neutral and generally applicable is invalid unless justified by a compelling governmental interest. But even a facially neutral law of general applicability might be discriminatory in violation of the Free Exercise Clause because of its design, operation, or effect, or in the manner in which it is enforced. *That* was the point of *Lukumi*, as we recognized in *Bloch*. Accordingly, the free-exercise neutrality inquiry starts with the text of the challenged law or regulation and proceeds from there to its operative

effect, and finally, to its application. *Lukumi*, 508 U.S. at 535 ("Apart from the text, the effect of a law in its real operation is strong evidence of its object."). If a law lacks neutrality or general applicability in any of these respects, "it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." *Id.* at 533.

Perhaps in an as-applied challenge one acceptable method of proof might involve the identification of a specific, better-treated, similarly situated comparator, as the Eleventh Circuit has held. *See Konikov*, 410 F.3d at 1327-29. That would make sense if the challenged regulation is truly neutral on its face and in effect, and the plaintiff contends instead that it was applied less than equally. But nothing in *Smith* or *Lukumi* requires a plaintiff to do this—certainly not in a case raising a *facial* free-exercise challenge, and not *necessarily* in a religious-gerrymander claim either, as the dissent in *Lighthouse Institute* explained. *See* 510 F.3d at 291-92 (Jordan, J., dissenting). On the Third Circuit's interpretation of the equal-terms provision, which is now this circuit's as well, the categorical exclusion of religious assemblies from a zone is acceptable—notwithstanding the inclusion of one or more secular assembly uses—as long as the included uses serve the regulatory purposes or criteria and religious uses do not. This eviscerates the equal-terms provision; in its practical effect, this test will defeat all facial equal-terms claims and perhaps most religious-gerrymander and as-applied challenges as well.

## B.

My colleagues have included an extensive explanation of the land-use policies underlying the modern practice of exclusive zoning, and in particular the regulatory justifications for separating commercial from noncommercial land uses. *See* Majority op. at 10-14. This discussion suggests that the commercial (for-profit, tax-generating) character of the activity in a business district is enough by itself to justify excluding religious land uses. Indeed, when it comes time to apply the restated equal-terms test—comparing River of Life to secular land uses that are "similarly situated" in relation to "accepted zoning criteria"—the court notes that "Hazel Crest has . . . created a commercial district that excludes churches *along with* community centers, meeting halls, and libraries because these secular assemblies, like a church, do not generate significant taxable revenue." Majority op. at 13-14. The court thus concludes that "[s]imilar assemblies are being treated the same. The permitted land use that is most like the plaintiff's is a commercial gymnasium, and that's not close enough because a commercial assembly belongs in an all-commercial district and a noncommercial assembly, secular or religious, does not." *Id.* at 14.

There are a couple of reasons why this analysis is flawed. First, the unmistakable implication is that comparing the excluded religious assembly to a permitted *commercial*—i.e., for-profit—assembly is either categorically improper or will always defeat the claim. But nothing in the text of the equal-terms provision presumptively rules out using commercial secular assemblies

and institutions for equal-terms comparison *just because* they are commercial and therefore "belong" in a commercial district.[6] Second, the focus on other *excluded* assemblies has the analysis backward. A decision method that justifies excluding religious assemblies from a zone because nonreligious assemblies are also excluded turns the equal-terms provision on its head. The equal-terms provision is a remedy against exclusionary zoning; reading it to require equality of treatment with *excluded* secular assemblies—rather than *included* secular assemblies—gives religious assemblies no remedy at all. The statute plainly requires religious-group equality with *permitted* secular assemblies, not *excluded* secular assemblies.

* * *

---

[6] Apart from the lack of textual support for this mode of analysis, RLUIPA's legislative history strongly contemplates a remedy for the exclusion of religious assemblies from zones where for-profit assemblies are permitted. *See* 146 CONG. REC. S7774 (2000) (joint statement of Sen. Hatch and Sen. Kennedy) (noting that zoning codes "frequently exclude churches in places where [the government] permit[s] theaters, meeting halls, and other places where large groups of people assemble for secular purposes"); *see also id.* S7774-75 ("Churches have been excluded from residential zones because they generate too much traffic, and from commercial zones because they don't generate enough traffic. Churches have been denied the right to meet in rented storefronts, in abandoned schools, in converted funeral homes, theaters, and skating rinks—in all sorts of buildings that were permitted when they generated traffic for secular purposes.").

In the end, the court's emphasis on the police-power legitimacy of exclusionary zoning evinces a degree of deference toward land-use regulation that is fundamentally inconsistent with RLUIPA and the First Amendment's guarantee of the right of free religious exercise.[7]

---

[7] My colleagues retreat from the Eleventh Circuit's interpretation of the equal-terms provision in part because they think it too "literal" and would if "[p]ressed too hard" impermissibly "give religious land uses favored treatment." Majority op. at 4. The court suggests that the Eleventh Circuit "added its 'strict scrutiny' gloss" in order "to avoid making its test overprotect religious assemblies in comparison to their closest secular counterparts," thereby "solv[ing] a problem of the court's own creation." *Id.* at 7-8. I think this misreads the caselaw. *Midrash Sephardi* held that RLUIPA is permissible § 5 remedial legislation to the extent that it codifies the Supreme Court's First Amendment free-exercise jurisprudence—specifically *Smith* and *Lukumi*. 366 F.3d at 1236-40. The Eleventh Circuit imported strict scrutiny not to "solve a problem of its own creation" but to conform the statute to *Lukumi* and *Smith*. *Id.* at 1232. As a doctrinal matter, the concern about "overprotecting" religious land uses is overstated. *See generally*, Michael W. McConnell, *The Problem of Singling Out Religion*, 50 DEPAUL L. REV. 1, 11 ("[T]he question of singling out religion is not one of 'privilege' but rather one of balance. The Free Exercise and Establishment Clauses serve a complementary function: to reduce the power of government over religion, whether to help, hurt, or control . . . ."). The Supreme Court has upheld § 3 of RLUIPA (the institutionalized-persons provision) against a claim that it impermissibly accommodates religion. *See Cutter v. Wilkinson*, 544 U.S. 709, 719-20 (2005) ("[W]e hold that

(continued...)

The presumptive validity of exclusionary zoning under *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926), is a presumption of validity against property-rights claims, which trigger only the very deferential rational-basis standard of scrutiny. Laws that burden free-exercise rights are not reviewed so leniently—not, that is, unless the law is truly neutral on its face, in its operative effect, and in its enforcement. The equal-terms provision reflects a congressional judgment about state and local regulation of religious land uses: Regulations that treat religious assemblies or institutions less well than nonreligious assemblies or institutions are inherently not neutral. The modified Third Circuit test adopted by my colleagues displaces this congressional judgment.

## V.

### A.

I think we should pick up where we left off in *Vision Church* and *Digrugilliers* and build on that foundation. The equal-terms provision is clear and supplies its own decisional methodology. The Eleventh Circuit correctly reads the provision textually, without glossing it with an artificial "similarly situated comparator" requirement

---

[7] (...continued)
§ 3 of RLUIPA fits within the corridor between the Religion Clauses: On its face, the Act qualifies as a permissible legislative accommodation of religion that is not barred by the Establishment Clause.").

that is more appropriate to ferreting out religious or sectarian animus. The statute itself selects the relevant comparison for making the "less than equal" determination: A land-use regulation (or land-use regulator) may not treat a "religious assembly or institution" less well than "a nonreligious assembly or institution." If the challenged regulation prohibits a religious assembly or institution from locating in a zone, then the pertinent question for equal-terms purposes is whether the regulation permits a secular "assembly" or "institution" to locate in the zone.

The terms "assembly" and "institution" are not defined in the statute, but they are not ambiguous in this context. A dictionary definition will give us enough meaning to decide most cases. *See FDIC v. Meyer*, 510 U.S. 471, 476 (1994) ("In the absence of a [statutory] definition, we construe a statutory term in accordance with its ordinary or natural meaning."). No doubt some uncertainty will remain at the margins; it's easy to say that a "meeting hall" is an "assembly" but harder to decide whether a restaurant or a hotel is as well. What the statute requires is a modest limiting principle that will resolve problems of vagueness in particular applications without altering the congressional command.

*Midrash Sephardi* looked to the standard- and law-dictionary definitions, and that's a good start. An "assembly" is "a group of persons gathered together, usually for a particular purpose, whether religious, political, educational, or social." WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE 125 (1996).

*Black's Law Dictionary* defines "assembly" as "[a] group of persons organized and united for some common purpose." BLACK'S LAW DICTIONARY 132 (9th ed. 2009). An "institution" is "an organization, establishment, foundation, society, or the like, devoted to the promotion of a particular cause or program, esp. one of a public, educational, or charitable character," WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY 988, or simply "[a]n established organization, esp. one of a public character," BLACK'S LAW DICTIONARY 869.

Only "assembly" uses are at issue here. After this lawsuit was filed, Hazel Crest amended its zoning ordinance to remove some of the most obvious secular assemblies from among the permitted uses in the B-2 zone—meeting halls, libraries, community centers, and the like. But the amended ordinance continues to permit hotels, motels, gymnasiums, health clubs, salons, restaurants, and taverns in the B-2 district; day-care centers are also included as an authorized special use. These establishments are harder to classify. Each one is a place where people assemble for a common purpose—having a meal at a restaurant, for example, or a drink at a tavern. But the ordinary understanding of the term "assembly" requires more; it requires a degree of group affinity, organization, and unity around a common purpose. This more nuanced understanding of the term narrows the range of establishments that qualify as secular "assemblies" under the equal-terms provision. Moreover, the focus should be on the property's primary use. Incidental uses should be disregarded; an establishment that only occasionally serves as an "assembly" will not qualify.

This limitation is especially important in facial equal-terms claims, where the comparison is categorical and requires generalizations about property uses.

**B.**

Applying these principles here, I think River of Life has a likelihood of success on its claim that Hazel Crest's amended ordinance facially violates the equal-terms provision. The ordinance excludes churches in the B-2 district but includes gymnasiums, health clubs, and day-care centers. Each of these property uses can be characterized as a secular assembly use as the term "assembly" is commonly understood. They are places where groups of people come together for a common purpose, and with a degree of organization and unity that brings each use within the meaning of the word "assembly" as it is used in this statute. Commercial gymnasiums and health clubs typically hold exercise and athletic classes of various kinds, as well as sports and social-club meetings and team competitions (think the YMCA or racquet and fitness clubs). Day-care centers are also characterized by a unity of purpose—the daily or periodic supervision and (usually) education of children—and are typified by an array of organized activities for the children in their care.

On the other hand, salons, hotels and motels, and restaurants and taverns likely do not qualify as "assemblies." Patrons of these establishments share a common purpose only in the loosest sense and are not usually organized or united to the degree required for an assembly. True, hotels and motels may have conference facilities

available for group meetings, but this organized group activity is incidental to the property's primary use, which is as a place for temporary lodging. Similarly, although organized groups may occasionally meet in restaurants or taverns, the primary use of a restaurant or tavern is as a place to buy a drink or a meal. And it's hard to think of a "salon" as an assembly, at least on the definition I've suggested here.

RLUIPA shifts the burden of persuasion to the government once the plaintiff "produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of section 2000cc of this title."[8] 42 U.S.C. § 2000cc-2(b). The Eleventh Circuit, as I have noted, interprets the statute to require strict scrutiny of land-use regulations that prima facie violate the equal-terms provision; this interpretation flows from the premise that RLUIPA codifies the Supreme Court's free-exercise jurisprudence—specifically *Smith* and *Lukumi*—and appears to be linked to the court's determination that the equal-terms provision is a valid exercise of Congress's § 5 power. *Midrash Sephardi*, 366 F.3d at 1231-36. The Third Circuit agreed in *Lighthouse Institute* that RLUIPA codified the Supreme Court's free-exercise jurisprudence but disagreed that the compelling-

---

[8] This procedure is modified in subsection (b)(1) "substantial burden" claims, which require the plaintiff to "bear the burden of persuasion on whether the [challenged] law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion." 42 U.S.C. § 2000cc-2(b).

interest standard of *Smith* and *Lukumi* was incorporated into the equal-terms provision. Because the "substantial burden" provision contains express language adopting strict scrutiny and the equal-terms provision does not, the Third Circuit held that a land-use regulation that violates the equal-terms provision is per se invalid and may not be justified even by a compelling governmental interest. *Lighthouse Inst.*, 510 F.3d at 269. The court thought its "similarly situated" secular-assembly requirement sufficiently narrowed the statute to avoid constitutional difficulty. *Id.* at 267 n.11 ("Because we limit the statute in this way, we are not concerned about Congress's authority under Section 5 to impose what amounts to a strict liability standard on regulations that violate the Equal Terms provision."). My colleagues align themselves with the Third Circuit's view.

Hazel Crest has not argued that the equal-terms provision exceeds Congress's § 5 enforcement authority. This is an important and sensitive question that should not be resolved unless raised and fully briefed. However, to the extent that an implied compelling-interest standard is required to sustain the statute under *City of Boerne*, Hazel Crest has not attempted to—and probably cannot—carry that burden. The economic-development and tax-generation objectives of its regulatory scheme are legitimate governmental interests but hardly compelling.

## VI.

The district judge thought River of Life's equal-terms claim had at least a slight likelihood of success on the

merits but declined to enter an injunction on the understanding that the balance of harms did not favor the church because the statutory claim should not be treated as analogous to a First Amendment claim, for which irreparable harm is presumed. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("The loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate, and injunctions protecting First Amendment freedoms are always in the public interest."). That was a mistake. RLUIPA enforces Free Exercise Clause rights, and its land-use provisions are to be broadly construed in favor of protecting religious exercise. *See* 42 U.S.C. § 2000cc-3(g) ("This chapter shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution."). As I have noted, the statute specifically provides that "[t]he use, building, or conversion of real property for the purpose of religious exercise" falls within the domain of "religious exercise." *Id.* § 2000cc-5(7)(B).

To the extent that this or any other of RLUIPA's land-use provisions goes beyond what is constitutionally required and constitutes prophylactic legislation to prevent or deter free-exercise violations, the district court's conclusion that River of Life has established irreparable harm is sound. River of Life is being prevented from moving its church to the property it owns in Hazel Crest, which is situated in a location that the congregation considers important to its religious mission. RLUIPA requires the Village to respect the church's right to relocate;

Hazel Crest permits some secular assembly uses in this neighborhood and therefore cannot exclude River of Life.

On the other side of the scale, Hazel Crest's assertions of irreparable harm are generalized and entirely conclusory. The Village contends that "by allowing [a] non-tax-paying, non-traffic generating entit[y] to locate within the [Hazel Crest Proper] hub," there is a "significant" potential for "interference" with its "community revitali-zation" goals. This is an implausible claim. First, the marginal loss of tax revenue attributable to the estab-lishment of a tax-exempt religious use in the district cannot be considered irreparable harm; if it were, then no injunction under RLUIPA would ever be possible. The claimed loss of traffic-generating potential (assuming this is a real concern) is entirely speculative. Hazel Crest has not bothered to explain how allowing a small church to locate in Hazel Crest Proper will otherwise impede its community-revitalization efforts. River of Life's con-crete loss of its RLUIPA rights easily outweighs the speculative harm to Hazel Crest's redevelopment plan.

For all the foregoing reasons, I would reverse the district court's order and remand with instructions to enter a preliminary injunction in favor of River of Life.