# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 08-4167

WORLD OUTREACH CONFERENCE CENTER and
PAMELA BLOSSOM,

*Plaintiffs-Appellants*,

and

UNITED STATES OF AMERICA,

*Intervening Appellant*,

*v.*

CITY OF CHICAGO,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 2891—**Wayne R. Andersen**, *Judge*.

No. 09-2142

TRINITY EVANGELICAL LUTHERAN CHURCH,

*Plaintiff-Appellant*,

*v.*

CITY OF PEORIA,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 07 C 1029—**Joe Billy McDade**, *Judge*.

ARGUED OCTOBER 30, 2009—DECIDED DECEMBER 30, 2009

Before CUDAHY, POSNER, and ROVNER, *Circuit Judges*.

POSNER, *Circuit Judge*. We have consolidated for decision two cases presenting the recurring issue of the rights of religious organizations to avoid having to comply with local land-use regulations. Analysis requires threading our way through a maze of statutory and constitutional provisions and we begin there, which is to say with the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. §§ 2000cc *et seq.*, Illinois's Religious Freedom Restoration Act, 775 ILCS 35/1 *et seq.*, and the Constitution's free exercise, establishment, and due process clauses.

The federal Act provides that a government land-use regulation "that imposes a substantial burden on the religious exercise of a . . . religious assembly or institution" is unlawful "unless the government demonstrates that imposition of the burden . . . is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1). The Act also provides that "no government shall impose or implement a land use

regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution," *id.*, § 2000cc(b)(1), or that "discriminates against any assembly or institution on the basis of religion or religious denomination." *Id.*, § 2000cc(b)(2). The Illinois law, 775 ILCS 35/15, is, so far as relates to this case, materially identical to section (a)(1) of the federal law, *Diggs v. Snyder*, 775 N.E.2d 40, 44-45 (Ill. App. 2002); *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 631 (7th Cir. 2007), and so it need not be discussed separately.

The City of Chicago, the defendant in World Outreach's suit, argues that the federal Act exceeds Congress's authority under section 5 of the Fourteenth Amendment (the "enforcement clause") citing *City of Boerne v. Flores*, 521 U.S. 507 (1997). But the Act happens also to be based on Congress's power to regulate commerce. 42 U.S.C. § 2000cc(a)(2)(B); see *Westchester Day School v. Village of Mamaroneck*, 504 F.3d 338, 354 (2d Cir. 2007). So the City shifts grounds, and argues that World Outreach's complaint contains "no hint that the application of the zoning ordinance here affected interstate commerce." In fact the complaint alleges that the City prevented World Outreach from renting rooms to refugees from Hurricane Katrina, and if the allegation is correct (the City does not contest it), the City interfered with a "shipment" of persons across states lines, which is a form of interstate commerce. E.g., *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 255-56 (1964); *United States v. Soderna*, 82 F.3d 1370, 1373-74 (7th Cir. 1996); *United States v. Cargo Service Stations, Inc.*, 657 F.2d 676, 679-80 and n. 1 (5th Cir. 1981).

But we do not mean to concede the City's contention that section 2000cc(a)(1) cannot also be grounded in the authority granted Congress by the enforcement clause. As we explained in *Saints Constantine & Helen Greek Orthodox Church v. City of New Berlin*, 396 F.3d 895, 897 (7th Cir. 2005), that section of the Act "codifies *Sherbert v. Verner*, 374 U.S. 398 (1963)," which *Boerne v. Flores* "reaffirmed . . . insofar as [*Sherbert*] holds that a state that has a system for granting individual exemptions from a general rule must have a compelling reason to deny a religious group an exemption that is sought on the basis of hardship or, in the language of the present Act, of 'a substantial burden on . . . religious exercise.' 521 U.S. at 512-14. *Sherbert* was an interpretation of the Constitution, and so the creation of a federal judicial remedy for conduct contrary to its doctrine is an uncontroversial use of section 5." See also *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 266-67 and n. 11 (3d Cir. 2007); *Guru Nanak Sikh Society of Yuba City v. County of Sutter*, 456 F.3d 978, 992-95 (9th Cir. 2006); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1237-40 (11th Cir. 2004). (Another constitutional basis of the Religious Land Use and Institutionalized Persons Act is the Constitution's spending clause. The Act creates a remedy for cases in which "the substantial burden is imposed in a program or activity that receives Federal financial assistance, even if the burden results from a rule of general applicability." 42 U.S.C. § 2000cc(a)(2)(A). But it does not appear to be applicable to this case.)

If we're right that section 2000cc(a)(1) of RLUIPA codifies *Sherbert v. Verner*, there isn't much point to a plaintiff's

adding a claim under 42 U.S.C. § 1983 alleging a *Sherbert*-type violation of the free exercise clause (as made applicable to state or local governmental action by the Supreme Court's interpretation of the due process clause of the Fourteenth Amendment). There are, it is true, other types of violation of the clause. If a state or local government deliberately discriminated against a religious organization (or against religion in general), it would be violating the free exercise clause even if the burden that the discrimination imposed on the plaintiff was not "substantial" within the meaning of RLUIPA. *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*, *supra*, 510 F.3d at 263; *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 170 (3d Cir. 2002); *Brown v. Borough of Mahaffey*, 35 F.3d 846, 849-50 (3d Cir. 1994). And if it were discriminating in favor of a religious organization or religion in general, it would also be violating the establishment clause. *Kerr v. Farrey*, 95 F.3d 472, 479-80 (7th Cir. 1996); *Commack Self-Service Kosher Meats, Inc. v. Weiss*, 294 F.3d 415, 426-27 (2d Cir. 2002). Discrimination by an official body can always be attacked as a violation of the equal protection clause—but that would usually add nothing, when the discrimination was alleged to be based on religion, to a claim under the religion clauses of the First Amendment. *Locke v. Davey*, 540 U.S. 712, 720 n. 3 (2004); *St. John's United Church of Christ v. City of Chicago*, *supra*, 502 F.3d at 638; *Eulitt ex rel. Eulitt v. Maine Dept. of Education*, 386 F.3d 344, 353-54 (1st Cir. 2004). But since discrimination against or in favor of a religious organization on religious grounds is expressly prohibited by section 2000cc(b) of RLUIPA, quoted earlier, we

cannot see any point in a plaintiff's pitching a religious discrimination claim on *any* provision of the Constitution, rather than just on the statute. *Koger v. Bryan*, 523 F.3d 789, 801 (7th Cir. 2008); *Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir. 2006).

Having cleared some underbrush, we turn to the first of our two cases, the suit by World Outreach (and its director, but her claim need not be discussed separately). The district court dismissed the suit for failure to state a claim, so we take the facts as true for purposes of deciding the appeal.

The World Outreach Conference Center is a Christian sect that operates a community center in a poor area on Chicago's south side called Roseland. World Outreach's mission, according to its home page (www.worldoutreachconferencecenter.org/about.html, visited Oct. 31, 2009), is

> to fulfill the great commission. . . ."Go ye into all the world, and preach the gospel to every creature." Our goal will be to prepare the neighborhood and surrounding community for the coming of Jesus Christ and to establish His Kingdom here on earth . . . . Love will be our badge of honor and we will be empowered with the Holy Spirit to live and care for the needy in our community on a personal, one on one basis. We will train, equip and empower the youth in our commuity [sic]. Our goal is to give generous assistance and relief to the needy and suffering in our neighborhood and surrounding community and donate to other organizations that share the same objectives.

The community center consists of a single building, which World Outreach bought from the YMCA in July 2005. The building is not a church as such. The premises mainly contain recreational and living facilities, but there is also space for religious services, and there is no doubt that even the recreational and other nonreligious services provided at the community center are integral to the World Outreach's religious mission, just as the rehabilitation centers operated by the Salvation Army are integral to the Salvation Army's religious mission. *Salvation Army v. Department of Community Affairs*, 919 F.2d 183, 187-88 (3d Cir. 1990); see *Schleicher v. Salvation Army*, 518 F.3d 472, 476 (7th Cir. 2008); cf. *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574-75 (2d Cir. 2002). Souls aren't saved just in church buildings.

World Outreach wanted to operate the center just the way the YMCA had done for the previous 80 years without any hindrance from the Chicago zoning authorities. In particular, like the YMCA, it wanted to rent the building's 168 apartments as single-room-occupancy units. The YMCA had done that without ever having been told by the City to obtain a Special Use Permit. For the YMCA's use of the building had been what is called a "legal nonconforming use." If a particular land use is begun at a time when the use conformed to the existing zoning regulations, and the zoning regulations are later changed to forbid such use, the user can continue his (no longer) conforming use without a Special Use Permit. See Chicago Zoning Ordinance §§ 17-15-0101, 0103; *Bainter v. Village of Algonquin*, 675 N.E.2d 120, 125 (Ill. App. 1996); *Illinois Life Ins. Co. v. City of Chicago*, 244 Ill. App. 185, 195-

97 (1927); cf. *Shrewsbury Edgemere Associates LP v. Board of Appeals*, 565 N.E.2d 1214, 1216-17 (Mass. 1991). The "nonconforming status runs with the land and is not affected by changes of tenancy, ownership, or management." Chicago Zoning Ordinance § 17-15-0106.

The land occupied by the building had been rezoned in 1999 as a Community Shopping District. A community center is a special use in such a district, requiring therefore a Special Use Permit. Chicago Zoning Ordinance § 17-3-0207(I)(1); see also § 17-3-0203. But since the YMCA's center was a legal nonconforming use, the zoning change had no effect on it and should likewise have had no effect on World Outreach when it bought the building.

To provide single-room occupancy, however, World Outreach needed to apply for a single-room-occupancy (SRO) license, for these licenses do not run with the land. Chicago Municipal Code §§ 4-209-010; 4-4-190. It applied in August 2005, the month after its purchase of the building, but was told that it couldn't have the license because it lacked a Special Use Permit to allow it to operate a community center in a Community Shopping District. Yet the City had voluminous files, including files of SRO licenses obtained by the YMCA after the rezoning, which showed that no Special Use Permit was required because the use made of the building, including single-room occupancy, was a legal nonconforming use. But a Chicago alderman named Beale, irate that the building had been sold to World Outreach rather than to a developer who was one of his financial backers, had proposed to the zoning committee of the Chicago City

Council that the property on which the building sits be rezoned as a Limited Manufacturing Business Park District. At a hearing before the zoning committee, World Outreach reminded the committee of its legal nonconforming use, but the committee chairman asserted that World Outreach needed to obtain a Special Use Permit if it wanted to continue the YMCA's practice of providing single-room occupancy.

The City Council approved the proposed amendment to the zoning ordinance in October 2005. A community center is not a special use in a limited manufacturing district, which means that no Special Use Permit *could* be granted to permit the World Outreach center to operate. But the operation could still be—and was—a legal nonconforming use, which requires no Special Use Permit. Nevertheless the City in December 2005 filed a suit in state court against World Outreach, in which it claimed that World Outreach had to obtain a Special Use Permit. The suit was frivolous and was voluntarily dismissed by the City, naturally without explanation, in April 2006. But still the City did not issue the SRO license, without indicating that there might be grounds for denying it.

Hurricane Katrina had struck New Orleans in August 2005. The next month the Federal Emergency Management Agency asked World Outreach to house victims of the hurricane in 150 single-room-occupancy units for a year, at a surprisingly high rental of $750 per room per month that would be paid by FEMA. The agreement was conditioned on World Outreach's obtaining an SRO license. The City refused to issue the license even though

officials from FEMA, from its Illinois counterpart, and from the Illinois Department of Human Services all urged the City to grant it and no ground for denying it existed.

World Outreach brought the present suit in April 2006, the dismissal of the state court suit having deprived it of that procedural vehicle for challenging the City's insistence on the necessity for a Special Use Permit. In August of the following year, with the suit pending, the City without explanation issued an SRO license to World Outreach even though the organization had not sought or obtained a Special Use Permit.

As a result of the City's actions beginning with the initial denial of the SRO license, World Outreach was impeded in its religious mission of providing living facilities to homeless and other needy people and incurred substantial legal expenses as well. It seeks damages, having abandoned its claim for injunctive relief when the City finally issued the SRO license that it had applied for two years earlier.

The district judge dismissed the complaint on the ground that requiring World Outreach to appeal the denial of a Special Use Permit to the board of zoning appeals did not impose a "substantial burden" on its religious activities. In effect he was ruling that World Outreach had failed to exhaust its administrative remedies. The principle is fine, *Grace Community Church v. Lenox Township*, 544 F.3d 609, 616 (6th Cir. 2008); *Murphy v. New Milford Zoning Commission*, 402 F.3d 342, 352 (2d Cir. 2005), but its application to this case perverse. World Outreach had no legal basis for seeking a Special Use Permit; a

community center cannot be a special use in the district in which the center is located, because of its rezoning as a manufacturing district.

It is true that World Outreach was first told that it needed a Special Use Permit three months before the land was rezoned to bar special uses. Had World Outreach obtained the permit before the rezoning, it would have been entitled to continue the permitted use as a lawful nonconforming use. But it was *already* entitled to continue the use of the center for single-room occupancy as a lawful nonconforming use, provided only that it obtained an SRO license, which it had applied for and the City had no grounds for denying. In any event, four months later, by bringing suit against World Outreach, the City chose the forum in which it wanted the organization's rights adjudicated; it can hardly be heard to criticize the organization for accepting that choice. The City then pulled the rug out from under its adversary by voluntarily dismissing its suit, by which time it was too late for World Outreach to seek a Special Use Permit, as the land had been rezoned to preclude a community center from being considered a special use.

World Outreach further alleges that the zoning board of appeals has a fixed policy of not acting on an appeal while an alderman's request for a rezoning is pending. Consistent with this allegation, the chairman of the zoning committee told World Outreach's lawyer at the hearing that World Outreach had two choices: obtain a Special Use Permit or sue the City. World Outreach

couldn't obtain a Special Use permit for land that was about to be rezoned to bar special uses, and so it brought this suit. The existence of "aldermanic courtesy" is confirmed in *Biblia Abierta v. Banks*, 129 F.3d 899, 901-02 (7th Cir. 1997). One of the aldermen in that case was the chairman of the zoning committee in this one and it was he who told World Outreach to apply for a Special Use Permit.

The picture painted by the complaint is of malicious prosecution of a religious organization by City officials, although the plaintiff doesn't use the term. Malicious prosecution is harassment by frivolous legal claims. *Reed v. Doctor's Associates, Inc.*, 824 N.E.2d 1198, 1205 (Ill. App. 2005); *Smart v. Board of Trustees*, 34 F.3d 432, 434 (7th Cir. 1994). That is an exact description of the conduct alleged in the complaint. The burden imposed on a small religious organization catering to the poor was substantial (for burden is relative to the weakness of the burdened), *Saints Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, *supra*, 396 F.3d at 899-901; *Westchester Day School v. Village of Mamaroneck*, *supra*, 504 F.3d at 350-53; *Bikur Cholim, Inc. v. Village of Suffern*, 2009 WL 1810136, at *22-23 (S.D.N.Y. June 25, 2009); Brian W. Blaesser & Alan C. Weinstein, *Federal Land Use Law & Litigation* § 7:18, p. 664 (2009), and there was no possible justification for it. The dismissal of World Outreach's substantial-burden (section 2000cc(a)(1)) claim under the Religious Land Use and Institutionalized Persons Act was therefore error.

World Outreach also makes a claim under section 2000cc(b) of the Act, which forbids discrimination

against an organization on religious grounds. See *Digrugilliers v. Consolidated City of Indianapolis*, 506 F.3d 612, 614 (7th Cir. 2007). The motive that World Outreach alleges for the City's campaign against it was Alderman Beale's desire that the YMCA have sold the property to his supporter; there is no indication that any purchaser, religious or nonreligious, other than the developer would have been treated better than World Outreach was. In other words, there was no discrimination against World Outreach on religious grounds. The City didn't treat the YMCA better than World Outreach on *any* grounds, religious or otherwise; the two organizations were not similarly situated; had the YMCA been in World Outreach's position of buying the center from the previous occupant, it would have been treated just as badly. The discrimination was in favor of a developer on the basis of his financial relationship to a politician. Religion didn't enter the picture.

What is true, however, is that a deliberate, irrational discrimination, even if it is against one person (or other entity) rather than a group, is actionable under the equal protection clause. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam); *Lauth v. McCollum*, 424 F.3d 631 (7th Cir. 2005); *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007-08 (7th Cir. 2000). That is one of the claims that World Outreach alleges; the claim is supported by the allegations of the complaint; and so it should not have been dismissed. It has nothing to do with religion, but so what?

The City is correct, however, that the claim of damages for violation of the Chicago Zoning Ordinance is barred

by the state's tort immunity act and therefore was properly dismissed. 745 ILCS § 10/2-104; *Village of Bloomingdale v. CDG Enterprises, Inc.*, 752 N.E.2d 1090, 1099 (Ill. 2001). We also do not think that World Outreach had any basis for seeking damages under Illinois Supreme Court Rule 137, which is materially the same as Rule 11 of the federal civil rules, as a sanction for frivolous motions in the state-court case that was dismissed, not in the present case; and Rule 11 does not authorize a judge to impose sanctions in a case in another court unless the case merely originated there and was removed to his court, as in *Griffen v. City of Oklahoma City*, 3 F.3d 336, 340-42 (10th Cir. 1993), and *Schmitz v. Campbell-Mithun, Inc.*, 124 F.R.D. 189, 192-93 (N.D. Ill. 1989). World Outreach also seeks sanctions under Rule 11 for the motion to dismiss that the City filed in the present case, but although the motion was weak it was not frivolous or otherwise sanctionable, or so at least the district judge could (and did) conclude without abusing his discretion.

So we move to our second case, which involves a challenge under the Religious Land Use and Institutionalized Persons Act to the application of Peoria's landmark law to the building shown in the photograph at the end of this opinion. The Trinity Evangelical Lutheran Church is located on property at the edge of downtown Peoria. In 1989 it bought an adjacent parcel that contained the building in the photo. Trinity applied to the city in 2000 for a permit to demolish the building. A neighborhood group filed an application to have the building designated a landmark under the City's preservation ordinance.

Peoria Municipal Code §§ 16-61, 16-86. The City granted the landmark application. Six years later Trinity again sought the City's permission to demolish the building so that it could build on its site a "Family Life Center." The City refused, and the refusal, Trinity argues, has imposed a substantial burden on its religious activities in violation of section 2000cc(a)(1) because the building is not suitable for the family-life center that Trinity envisages. The district court, disagreeing, granted summary judgment in favor of the City.

Any land-use regulation that a church would like not to have to comply with imposes a "burden" on it, and so the adjective "substantial" must be taken seriously lest RLUIPA be interpreted to grant churches a blanket immunity from land-use regulation. We shall assume that determining whether a burden is substantial (and if so whether it is nevertheless justifiable) is ordinarily an issue of fact (oddly we cannot find a reported opinion that addresses the question) and that substantiality is a relative term—whether a given burden is substantial depends on its magnitude in relation to the needs and resources of the religious organization in question. *Vision Church v. Village of Long Grove*, 468 F.3d 975, 999-1000 (7th Cir. 2006); *Westchester Day School v. Village of Mamaroneck*, *supra*, 504 F.3d at 349.

The burden imposed on Trinity, a substantial religious organization, by the landmark designation that disables it from demolishing the apartment house is modest. The building has not been rendered uninhabitable by the designation. Trinity can sell it and use the proceeds to

finance the construction of its family-life center. It argues that it "lost money renting the building prior to seeking demolition" and that the building is "not economically viable for residential use," but there is no support in the record for these contentions. The prohibition against demolition could harm Trinity only if there were no suitable alternative site for building a family-life center. But there is—a 50-foot-by-80-foot empty lot on Trinity's campus. Trinity complains that it would need certain zoning permits to build there which the City might deny it—but the City has committed itself in its brief and at oral argument to granting them. We imagine that the real purpose of this litigation is to extract a commitment from the City to allow Trinity to build the family-life center on the empty lot, and so viewed the suit has succeeded.

The judgment in World Outreach's case is affirmed in part and reversed in part, as explained earlier. The judgment in Trinity Evangelical Lutheran Church is affirmed.

## Peoria Landmark

