In the

# United States Court of Appeals
### For the Seventh Circuit

_____

Nos. 13-3669, 13-3728

WORLD OUTREACH CONFERENCE CENTER and PAMELA
 BLOSSOM,

*Plaintiffs-Appellants/Cross-Appellees*,

*v.*

CITY OF CHICAGO,

*Defendant-Appellee/Cross-Appellant*.

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 6 C 2891— **Joan Humphrey Lefkow**, *Judge*.

_____

ARGUED MARCH 31, 2015 — DECIDED JUNE 1, 2015

_____

Before CUDAHY, POSNER, and ROVNER, *Circuit Judges*.

POSNER, *Circuit Judge*. This appeal (actually appeal and
cross-appeal) from a district court decision that attempted to
resolve a messy and protracted litigation is a sequel to an
appeal that we decided five and a half years ago in *World
Outreach Conference Center v. City of Chicago*, 591 F.3d 531 (7th
Cir. 2009); the reader's familiarity with our earlier opinion is
assumed, enabling us to abbreviate our discussion.

The former appeal was brought primarily (and for the sake of simplicity we'll assume only) by the World Outreach Conference Center, a Christian religious organization in Chicago. (We'll call it, for the sake of brevity, "World Outreach," but the reader should understand that the World Outreach Conference Center is only one World Outreach religious organization.) It challenged the district court's dismissal of the suit on the pleadings. We agreed with the challenge, and reversed the district court's decision and remanded the case. World Outreach's current appeal is from the grant of summary judgment (by a different district judge, her predecessor having resigned) in favor of the City on all but one of World Outreach's claims. The City's cross-appeal is from the judge's grant of partial summary judgment in favor of World Outreach on that claim. The effect of the two partial grants of summary judgment was to terminate the litigation, begun nine years ago.

The only basis for the suit that requires discussion (it is duplicated by the other grounds alleged) is the provision in the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. §§ 2000cc *et seq.*, that a land-use regulation "that imposes a substantial burden on the religious exercise of a … religious assembly or institution" is unlawful "unless the government demonstrates that imposition of the burden … is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1). We can ignore the "unless" clause, as the City's argument is limited to denying that it imposed a substantial burden on World Outreach's religious activities; it does not assert "a compelling governmental interest" in do-

ing so or deny that World Outreach is indeed a religious institution.

World Outreach (which remember is our abbreviation of World Outreach Conference Center) emphasizes assistance to the poor. See World Outreach Conference Center, "Mission Statement," www.worldoutreachconferencecenter.org/index.php?option=com_content&view=article&id=47&Itemid=53 (visited May 8, 2015). Its only facility is a building that it bought from the YMCA in July 2005, located in a poor area on Chicago's south side. The building has several floors. The first floor has a swimming pool, two gyms, and several meeting rooms sometimes used for religious services. The upper floors have a total of 168 single-room apartments called single-room occupancy—SRO—units. As the YMCA had done, World Outreach rents these apartments on a temporary basis to needy persons.

The YMCA needed to get a license every year, as did its successor as owner of the building, World Outreach, to permit it to rent rooms. The YMCA had had no trouble getting the license year after year even after the area in which its building was located had been rezoned as a community shopping district, in which residential use would not be permitted. For the YMCA's residential use of the 168 rooms was what is called a "legal nonconforming use"—nonconforming because it didn't conform to the new zoning ordinance but legal because its nonconforming use was grandfathered; a "nonconforming status runs with the land and is not affected by changes of tenancy, *ownership*, or management." Chicago Zoning Ordinance § 17–15–0106 (emphasis added). So World Outreach's use of the building for the

same basic purposes as the YMCA (which is also of course a religious organization) was legal.

The passage we just quoted from the zoning ordinance has a further significance. A change in ownership as such has no effect on a building's status as a legal nonconforming use. And the City's zoning department had no reason to think that the change of ownership in this case would significantly change the use to which the building was put. World Outreach wasn't intending to tear the building down, consolidate the 168 single rooms into a dozen luxury suites, or fill the swimming pool with golden carp; it intended to use the building as the YMCA had used it. It is true that at first Pastor Blossom, the director of World Outreach, was unclear whether she would continue to rent the SROs. She thought she might replace them with a conference center, office space, day care center, Christian nightclub, and bible school. But she never followed through with that idea. Instead she sought a license to continue renting the SRO units, as the YMCA had done.

World Outreach encountered great difficulty in obtaining the licenses it needed (the one we just mentioned, plus a license to operate the community center). Such licenses must be obtained annually by the building's owner, not to prove legal nonconforming use but to make sure that the building is being operated in conformity with the City's building code. The reasons for the difficulty that World Outreach encountered in obtaining the required licenses remain obscure even after all these years of litigation. But on the basis of the evidence compiled to date (remember that there has been no trial), the likeliest reasons appear to be incompetence by the City's zoning department, a desire of the alderman (Antho-

ny A. Beale) of the Ninth Ward, in which the building is located, that the building be owned either by Chicago State University or Provider Realty Corporation, or fumbles on the part of World Outreach.

Chicago aldermen are powerful figures in the city's political system, and Alderman Beale may have pressured the City's zoning department to prevent World Outreach from using the building as it intended even though the intended use would be virtually identical to that of its predecessor the YMCA, which had owned and operated the building for eighty years. His stated reason for opposing World Outreach's buying the building—and for all we know his primary or even sole reason—was concern that World Outreach wouldn't be able to afford the repairs that the building apparently needed. We don't know the current status of those repairs.

The zoning department refused to grant World Outreach a license, ostensibly because World Outreach didn't have a Special Use Permit (SUP), which would have permitted the building to be used for a purpose (residence) forbidden by the current zoning of the area in which the building was located. The department should have known—maybe did know, since the YMCA's prior use of the facility was noted in its records—that World Outreach didn't need a Special Use Permit, because its intended use of the building was as a legal nonconforming use—basically it was continuing the YMCA's use of the building, only under a different name. It did need, and promptly after buying the building applied for, both a license to operate the community center in the building (that is, the facilities on the first floor) and an SRO license to allow it to rent the 168 single-room occupancy

units. But the City refused to issue the SRO license, on the ground that it could not lawfully do so until World Outreach obtained a Special Use Permit. World Outreach did need an SRO license in order to be allowed to rent the rooms, just as it needed a license to operate the community center, in order to certify the facilities' compliance with the City's building code. But it didn't need—and after September, when the area was reclassified as a Limited Manufacturing/Business Park District, could no longer have gotten—a Special Use Permit.

In December 2005 the City backed up its unlawful insistence that World Outreach obtain a Special Use Permit by suing World Outreach in an Illinois state court, contending that the religious organization's use of the building as a community center and church or religious assembly was illegal because it had no SUP. The complaint, consisting of 66 paragraphs of accusations and demands, was frivolous, and was voluntarily abandoned by the City in April of the following year. World Outreach, which had informed the City prior to dismissal that it planned to file counterclaims, promptly asserted its claims in a separate suit that it filed in state court. The City removed the case to federal court, kicking off the present litigation. Finally, in August 2007, two years after World Outreach had bought the YMCA's building—and according to World Outreach, after the City had required information on World Outreach's permit applications far beyond anything it had required of the YMCA—the City relented and licensed World Outreach to operate the building as a community center (using the facilities on the first floor of the building) and to rent the 168 rooms on the upper floors for single-room occupancy. Yet according to World Outreach the City continued harassing it, by conducting in-

spections with a frequency unknown when the YMCA had occupied the building (using it for essentially identical purposes).

The City's state court suit against World Outreach was indeed frivolous, as the district judge in this second round of the litigation ruled on summary judgment. Some very minor claims included in the suit may have had merit, such as that World Outreach had committed off-street parking violations and posted signs without obtaining proper permits, but the district judge was properly skeptical that the City would have filed a lawsuit based on just those claims, as opposed to issuing parking tickets or other minor administrative penalties. The judge was also on sound ground in ordering the City to reimburse World Outreach for the litigation expenses that it incurred in that suit; for such an award is of course a conventional remedy for having to defend against a frivolous suit. It's true that to show that the suit violated RLUIPA, World Outreach had to show that the attorneys' fees that it had incurred constituted a "substantial burden" on its religious activities. It's hard to imagine a vaguer criterion for a violation of religious rights. But a frivolous suit aimed at preventing a religious organization from using its only facility—a suit that must have distracted the leadership of the organization, that imposed substantial attorneys' fees on the organization, and that seems to have been part of a concerted effort to prevent it from using its sole facility to serve the religious objectives of the organization (to provide, as a religious duty, facilities for religious activities and observances and living facilities for homeless and other needy people)—cannot be thought to have imposed a merely insubstantial burden on the organization.

A more difficult question is whether the district judge was also correct to grant summary judgment in favor of the City with respect to World Outreach's remaining claims. Remember that it took it two years to obtain the licenses it needed in order to be able to operate its building for the religious purposes that it intended. The district judge thought that the responsibility for the delay lay with World Outreach's failure to prove to the City's satisfaction that the building would be safe and, in particular, that its 168 SRO rooms would be habitable. The judge noted that the YMCA had had a number of citations for building code violations pending when it sold the building. The zoning department told World Outreach in May 2006 that it would have to submit to the department, among other things, "architectural drawings of every floor and the entire building" and the "square footage of every floor and the entire building." World Outreach did not fully comply for eight months. But it had been an odd request, for the zoning department must have had this information already, dating from the YMCA's ownership of the building. The change in ownership had not changed the size or shape or design of the building. If the zoning department was concerned about changes that World Outreach was thinking of making in the building's interior, it could have asked it for the building plans relating to any projected changes. The request in its expansive scope thus looks like harassment. But even if this is wrong, and World Outreach's other excuses for delay in complying are rejected, the consequence would merely be to shorten, rather than to eliminate, the period during which it was wrongfully denied the licenses it needed in order to be permitted to operate the building in accordance with its religious plans. The effect of

invalidating all its excuses would thus be limited to reducing the damages it could prove.

The evidence presented in support of and opposition to the City's motion for summary judgment was too well balanced to justify the district judge in granting the motion. There was the animosity of the alderman to be considered, along with the fact that Chicago aldermen exercise significant power over activities of City government in their wards. There was the fact that the YMCA had accumulated a great number of citations for building code violations over the years, yet its licenses to operate the community center in the building and to rent the 168 rooms had always been issued in the ordinary course. (Maybe the zoning department considered the YMCA a more "respectable" religious organization than World Outreach; it is certainly older and better known.) There is the mysterious, and possibly malevolent, insistence by the City, contrary to its own ordinance, that World Outreach required a Special Use Permit for the building.

We do not say that World Outreach proved its case, other than with regard to the frivolous suit that the City had brought against it. But this is just to say that a trial is required to determine the rights of the parties; for contrary to the decision of the district court, a reasonable jury could find, especially by comparison with how the City had treated the YMCA's ownership and virtually identical management (replete with building-code violations) of the building, that the City had arbitrarily imposed a substantial burden on World Outreach's religious activities. We can understand the judge's desire to end a litigation that will soon have lasted as

long as the Trojan War, but we do not think that the end is yet in sight.

For guidance on remand, we consider finally the largest element of damages sought by World Outreach, besides the expenses it incurred, which the district judge properly awarded to it, in defending against the City's frivolous suit. Hurricane Katrina struck New Orleans and other places on the Gulf Coast late in August of 2005 with enormous destructive force. Many thousands of residents of the region had to be evacuated. As many as 10,000 of them may have been evacuated to Chicago. Living quarters had to be found for them. World Outreach volunteered its rooms, which at the time were still empty. There is evidence that it might have been able to charge the state or federal governments $750 a month, for an entire year, for each evacuee that it housed, had it been permitted by the City to rent its rooms (it was forbidden, because it had been denied a license to rent them); and $750 times 12 months times 168 rooms is $1,512,000. World Outreach would have incurred some expenses but probably have cleared a tidy profit to use for its other activities—$591,000, it says.

But the evidence it presented is weak. It is limited to a few statements by Ronald Carter, the Director of Strategic Planning of the Illinois Department of Human Services—statements uttered before any final arrangements for Katrina evacuees had been made by FEMA (the Federal Emergency Management Agency)—that World Outreach's SRO units could be used to house evacuees. It is uncertain whether World Outreach would have received *any*, let alone 168, evacuees, let alone for a full year (there is no evidence of how long evacuees remained in Chicago before returning

home), even if the City had allowed it to rent the rooms, rather than insisting erroneously on the necessity of a Special Use Permit. World Outreach has presented no evidence of where the evacuees to Chicago ended up being housed, or for how long, or at what expense to government agencies, and whether World Outreach's SRO units would have been preferred by the Illinois Department of Human Services or by FEMA to accommodations in other buildings in Chicago. There is no indication that Carter was authorized to place evacuees with World Outreach, and his strongest statement was merely that he was "very interested in the facility." (In a similar vein, another official with the Department said "I didn't see any reason why I would not use them [i.e., World Outreach] as a referral.") There has been a failure of proof, which leaves us uncertain whether World Outreach can recover substantial damages.

But that is an issue for trial. At this stage of the litigation we can only affirm the grant of partial summary judgment in favor of World Outreach (regarding the attorneys' fees it sought as compensation for having to defend itself against a frivolous suit by the City), reverse the grant of partial summary judgment to the City, and remand the case to the district court with directions to proceed in conformity with this opinion.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

CUDAHY, *Circuit Judge*, concurring.


Unfortunately; and I think the opinion must be stamped with a large "MAYBE."