In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 23-1175

EDGEWOOD HIGH SCHOOL OF THE SACRED HEART,
INCORPORATED,

*Plaintiff-Appellant,*

*v.*

CITY OF MADISON, WISCONSIN, *et al.*,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:21-cv-00118-wmc — **William M. Conley**, *Judge.*

_____

ARGUED SEPTEMBER 26, 2023 — DECIDED MARCH 15, 2024

_____

Before WOOD, SCUDDER, and ST. EVE, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Upset by decisions allegedly limiting its installation and use of nighttime lights at its athletics field, Edgewood High School of the Sacred Heart sued the City of Madison under the Religious Land Use and Institutionalized Persons Act, the Free Exercise Clause of the U.S. Constitution, and Wisconsin law. Following discovery the district court entered summary judgment for the City,

concluding that Edgewood's claims suffered in the main from fatal evidentiary shortcomings and in other places from misunderstandings of governing legal principles. We agree and affirm.

## I

## A

This case is messy on many levels. To help frame the issues before us, we begin with an overview of the municipal zoning ordinance that features most heavily in the facts.

In 2013 the City of Madison rezoned the campuses of major educational and medical institutions as "Campus-Institutional Districts." See Madison General Ordinance (M.G.O.) § 28.097 (2013). The new zoning aimed to support those institutions' "growth and development needs" while still "protect[ing] the livability and vitality of adjacent neighborhoods." *Id.* § 28.097(1). Any institution zoned as a Campus-Institutional District received the option of proposing a "campus master plan" to outline a long-term blueprint for land development and use. A master plan had to describe the "[e]xisting conditions" on campus—to include "[l]and uses and buildings" and "[n]atural features and significant open-space areas"—and identify "[p]roposed conditions" relating to "[f]uture needs/capital improvements," "[l]andscape treatment," and "[o]pen-space areas and other open-space uses." *Id.* § 28.097(5)(c). The plan also had to provide a "summary of previous planning efforts by the institution in conjunction with the City and/or abutting neighborhoods." *Id.* § 28.097(5)(a).

Approval of a master plan by the City's Plan Commission and Common Council meant that the institution would be

exempted from having to seek a conditional use permit for any building projects covered by the plan for a period of ten years. *See id.* § 28.097(2), (5)(c), (6), (7)(c). This exemption likewise meant, among other things, that covered projects would not require a public hearing to receive municipal approval. The new Campus-Institutional District ordinance instead accounted for the community's interests by conditioning the City's approval of a master plan on the degree to which the plan "serve[d] the public interest" and satisfied the "intent" of the overall ordinance. See *id.* § 28.097(6). Once approved, a master plan became an enacted ordinance of the City of Madison.

To alter an enacted master plan—by, for example, updating the "proposed use of [an] identified open space[]"—an institution had to obtain the approval of the City's Plan Commission. *Id.* § 28.097(8). There were two exceptions. First, "minor" alterations did not require Plan Commission approval. *Id.* Second, "substantial" changes to the original master plan required both Plan Commission and Common Council approval. *Id.*

B

Established in 1881, Edgewood High School is a private Catholic high school situated between two residential neighborhoods in the City of Madison. Edgewood's mission is to "educate the whole student—mind, body, and soul," to which end the school promotes Dominican values as part of a college preparatory curriculum. The high school also offers more than twenty athletic programs. Its campus includes a track and athletic field that the high school has used for decades—and, indeed, throughout the relevant time period—to host daytime practices and competitions.

Because the field does not have lights, Edgewood athletes have historically played nighttime soccer and football games at alternate locations in Madison. Another Campus-Institutional District institution, Madison West High School (a public school), likewise uses alternate locations for nighttime games because it does not have lights at its own field.

In 2014 Edgewood submitted a detailed master plan under the City of Madison's Campus-Institutional District ordinance. The plan was the "product of extensive engagement, collaboration, and effort" between Edgewood and the surrounding community. In its plan, Edgewood described a ten-year vision for the development and use of its land, identifying a series of proposed buildings and parking structures. In no place did the plan identify outdoor lighting for the athletic field as a proposed use, however. Nor did the plan identify the hosting of games or other competitions as an existing or proposed use of the athletic field. Instead, the plan more narrowly provided that Edgewood used its "[a]thletic field" for "team practices, [and] physical education classes."

The present controversy began in 2017, when Edgewood informed the City of Madison that it planned to install lights, seating, restrooms, and concession stands at its athletic field. A city alder informed the school that it would need to amend its master plan before pursuing the project. Edgewood submitted a proposal to add the amenities but tabled the amendment to its master plan after concluding that Madison's Common Council was unlikely to grant approval. At that point Edgewood attempted to sidestep the master plan process entirely by applying instead for a standalone lighting permit under the City's general lighting ordinance, Madison General Ordinance § 10.085, which required only that the lighting

comply with certain technical specifications and "all other codes and regulations as applicable." *Id.* § 10.085(1), (3), (4).

The City denied Edgewood's separate application for a lighting permit. The City Attorney explained that because Edgewood's existing master plan mentioned neither lighting nor competitive field use, the school could not install lighting for nighttime games without violating "other [applicable] codes and regulations." See M.G.O. § 10.085(1). The City viewed Edgewood's master plan, in other words, as an applicable municipal regulation under the lighting ordinance. The City's denial of the lighting permit on this ground meant that Edgewood could not avoid seeking an approved modification of its master plan simply by applying for a standalone permit under Madison's general lighting ordinance. The school would have to seek the Plan Commission's approval to alter its master plan after all.

When neighbors later complained that Edgewood was hosting games on its field (rather than just practices or physical education classes as described in the high school's master plan), the City issued notices of violation. Edgewood appealed the notices even though they did not impose fines or any other sanctions. The Zoning Board of Appeals upheld the notices, but the City Attorney later wrote to Edgewood to clarify that no further action would be taken unless the school was given ample notice. Since then, Edgewood has continued to play daytime games on its field, a point the high school acknowledged during oral argument.

Shortly after issuing the notices of violation, the City suggested that Edgewood come into full compliance with municipal law by repealing its master plan so that it could use its field for competitions. At that time, Campus-Institutional

District institutions without master plans enjoyed default "rights of use" with respect to "outdoor sports and recreational facilities" that extended to hosting games. Repeal of the master plan, moreover, would have allowed Edgewood to comply with the City's lighting ordinance if the high school reapplied for a traditional lighting permit. Edgewood could not violate the master plan as an "applicable regulation," in other words, if the master plan no longer governed the school's land-use decisions. Believing that nighttime games were finally within reach, Edgewood accepted the City's advice and requested a repeal of its master plan.

But nighttime games were still not to be. In October 2019, while Edgewood's proposed repeal of its master plan was pending, the City amended the Campus-Institutional District ordinance to require any institution without a master plan to obtain conditional-use approval for the "establishment, improvement, or modification of any [right of use] occurring outside of an enclosed building." M.G.O. § 28.097(2)(d) (2019). The City's Common Council voted to repeal Edgewood's master plan shortly thereafter. As an institution without a master plan, Edgewood believed that the newly revised Campus-Institutional District ordinance now required a conditional-use permit for the lighting addition.

So Edgewood applied for a permit in March 2020. The Plan Commission denied the request, finding that the permitting standards had not been met because the high school's installation of lights "would have a substantial negative impact on the uses, values, and enjoyment" of neighboring properties, and because "no mitigating measures [were] proposed" to limit the negative impacts, such as "noise barriers" or

"limits on events." The City's Common Council affirmed the Plan Commission's decision.

Edgewood's athletic field remains without lights to this day.

C

In February 2021 Edgewood sued the City of Madison, Plan Commission, and others under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.*, alleging that the City selectively enforced its Campus-Institutional District and general lighting ordinances in violation of the statute's "equal terms" and "substantial burden" provisions. See *id.* § 2000cc(a)(1), (b)(1). The RLUIPA claims and a related claim under the Free Exercise Clause of the U.S. Constitution survived dismissal, along with a supplemental property-based claim under Wisconsin law.

Following discovery, the district court entered summary judgment on all claims for the City and other named (and related) defendants. As for the RLUIPA claims, the district court concluded that the evidence in the record did not reveal a material issue of fact as to whether the City treated Edgewood less favorably than other institutions. The district court further concluded that Edgewood was not substantially burdened in the exercise of its religious mission by not being able to install lights at its athletic field for nighttime games.

The district court bypassed Edgewood's Free Exercise claim, explaining that RLUIPA provides greater protection than the First Amendment. The district court also resolved the state law vested rights claim in the City's favor because Edgewood's lighting permit application did not strictly comply with all relevant zoning ordinances at the time of its

submission, as required in order for the right to a permit to vest under Wisconsin law.

Edgewood now appeals.

## II

Congress enacted the Religious Land Use and Institutionalized Persons Act in 2000 to provide "broad protection" for religious exercise. See 42 U.S.C. § 2000cc-3(g). The statute requires municipalities to offer "equal terms" of land use to religious and nonreligious institutions, *id.* § 2000cc(b)(1), and to avoid placing a "substantial burden" on religious exercise though zoning regulations, *id.* § 2000cc(a)(1). The statute includes a private right of action to "obtain appropriate relief against a government." *Id.* § 2000cc-2(a).

### A

RLUIPA's equal terms provision states that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." *Id.* § 2000cc(b)(1). The provision means what it says: a municipality violates the equal terms mandate upon treating a religious land use "worse" than a comparable nonreligious use, "whether or not the discrimination imposes a substantial burden on the religious use[]." *Digrugilliers v. Consol. City of Indianapolis*, 506 F.3d 612, 616 (7th Cir. 2007).

Edgewood presses two distinct reasons for why it believes the City of Madison violated RLUIPA's equal terms provision. We address each in turn.

**1. *Hosting Games on the Field Generally*.** Edgewood's first contention is both broad and confusing. The high school tells

us that the City has altogether prohibited it from hosting any and all games—day or night—on its athletic fields. The contention caught the district court off guard because the discovery record contains unrefuted evidence that Edgewood has long used its field to host daytime games. By the district court's measure, the whole case was about the installation of lights for night games, not the playing of games during the day. So it understandably made little sense to the district court that the high school was somehow trying to root a RLUIPA equal terms claim in the counterfactual position that the City barred daytime use of the field for games. In the end, the district court rejected this aspect of Edgewood's claim on the merits and entered summary judgment for the City.

We too have some confusion about Edgewood's focus on daytime games. The high school's counsel confirmed during oral argument that Edgewood has long hosted (and continues to play) daytime games on its field. To our mind, then, Edgewood's claim cannot be about any past inability to use the field for that purpose. Perhaps what Edgewood is saying is that it faced a risk of curtailed daytime use of the field that amounted to unequal treatment.

We do not see it. All indications are that the City's past issuance of notices of violation amounted to nothing more than paper warnings. They were unaccompanied by fines or any other form of sanction or penalty relating to present or future use of the field. Indeed, the record shows that the City even promised not to enforce the notices of violation without first providing Edgewood ample notice. But that never happened. And once Edgewood withdrew its master plan, there seems to have been no concern on the City's part about the high school hosting daytime events at its field.

This aspect of Edgewood's appeal need not detain us further. The proper focus instead is on Edgewood's efforts to install lights for nighttime events, the subject to which we now turn.

**2. *Nighttime Lighting of the Field.*** The second strand of Edgewood's equal terms claim gets much closer to the heart of the case. It is here that the high school tells us many times over that its focus is on its inability to receive permission to install lights to allow the hosting of nighttime games on its athletic field.

Edgewood approaches this dimension of its claim by insisting that we concentrate on the City's denial of the high school's application for a general lighting permit. Notice what we did not say there: Edgewood is not tethering this aspect of its RLUIPA equal terms claim to anything involving its status as a master plan institution under the City's Campus-Institutional District ordinance. It instead wants us to conclude that it should be able to proceed to trial on the theory that the City treated the high school worse (or, in statutory terms, on less than equal terms) than institutions within Madison that did receive a general permit to install lights at their institutions. Those two institutions, Edgewood says, are Vel Phillips Memorial High School and the University of Wisconsin at Madison.

But the deficiency the high school cannot overcome, as the district court recognized, is that Edgewood—at all relevant points in time—was never comparable *from a regulatory perspective* to Memorial High School or UW-Madison. See *River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.*, 611 F.3d 367, 373 (7th Cir. 2010) (explaining that an equal terms claimant

must show differential treatment from the standpoint of an "accepted zoning criterion").

When Edgewood applied for a general lighting permit in February 2019, the high school was regulated for land-use purposes as a master plan institution under the City of Madison's Campus-Institutional District ordinance. That regulatory reality had consequences: Edgewood could pursue those development projects enumerated within its master plan, but the high school could not pursue other capital improvements without amending that same plan pursuant to the process outlined in the City's regulations. Remember that Edgewood at one point pursued an amendment, but then withdrew that request and instead sought to receive permission to install lights at its field by receiving a lighting permit under the City's general land-use regulations—in other words, outside the terms and conditions of the Campus-Institutional District ordinance governing master plan institutions. The City did not permit the bypass and instead insisted that Edgewood pursue lighting permission within the parameters of the master plan regulatory scheme.

With the factual record straight, we cannot conclude that the district court committed error in entering summary judgment for the City on this aspect of Edgewood's equal terms claim. The district court saw the record as clear (and not materially disputed) on the point that matters most—whether Edgewood was able to identify another master plan institution (be it Memorial High School, UW-Madison, or another local institution) that received permission to install lighting. Edgewood failed to make this showing, for Memorial and UW-Madison were not master plan institutions at the time they sought permission to install lighting at their fields. In

short, Edgewood has not brought anything to our attention (at least with any clarity) to create a jury issue on this aspect of its equal terms claim.

That evidentiary shortfall proved fatal because, as the district court explained, it left the high school without any way of showing a jury that the City of Madison applied the same land-use regulations one way for Edgewood and another more favorable way for a comparable institution. See *Vision Church v. Village of Long Grove*, 468 F.3d 975, 1003 (7th Cir. 2006) (rejecting a RLUIPA equal terms claim because "the fact that [plaintiff church] and the [secular] elementary schools were subject to different standards because of the year in which their special use applications were considered compels the conclusion that there was no unequal treatment"). In the final analysis, Edgewood was a master plan institution throughout the relevant period and was not comparably situated—for municipal land-use regulatory purposes—to Memorial High School or UW-Madison.

In a final effort to salvage its equal terms claim, Edgewood resorts to highlighting the City's circuitous and sometimes-contradictory handling of its permit application. The high school sees the treatment it received as more than frustrating red-taping and instead affirmative proof of bad faith on the City's part. From there it urges the conclusion that the bad faith shows unequal treatment within the meaning of RLUIPA.

We cannot get there. At bottom, we think Edgewood is really just trying to say that the City gave it the runaround with respect to the installation of lights at its field. But getting the runaround and being discriminated against are not necessarily one and the same. Edgewood's feeling that it was given

a hard time does not amount to a RLUIPA violation without evidence that the City treated a secular institution more favorably during the permit application process. Indeed, absent any showing of unequal treatment, Edgewood's claim sounds more properly in due process or takings. With the evidence in the record not allowing a reasonable juror to find that the City treated Edgewood's lighting application worse than comparable applications, we affirm the district court's entry of summary judgment for the City on the equal terms claim.

B

Edgewood's substantial burden claim under the Act likewise fails.

RLUIPA prohibits the government from "impos[ing] or implement[ing] a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden … (A) is in furtherance of a compelling government interest; and (B) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1). Congress defined "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id*. § 2000c-5. The enactment further provides that "[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." *Id.* § 2000cc-5(7)(B).

Against this definition of "religious exercise," we remain doubtful that the hosting of nighttime athletic competitions constitutes "religious" activity. The district court put the same

observation this way: "[w]hether or not athletics can be found important to Edgewood's Catholic educational mission says little, if anything, about the need to use the field at night." We can put our doubts to the side, though, because the City effectively conceded on appeal that the hosting of games at Edgewood's athletic field constitutes religious activity. We accept that concession for purposes of this appeal.

It would be a bridge too far, however, to conclude that Edgewood's inability to host nighttime competitions at its field imposes a "substantial burden" on its Catholic mission. Congress did not define "substantial burden" in RLUIPA, but we have examined the term in the land-use context and concluded that the availability of other adequate properties to host religious activities may defeat a substantial burden claim. See *World Outreach Conference Ctr. v. City of Chicago*, 591 F.3d 531, 539 (7th Cir. 2009) (declining to find a substantial burden under RLUIPA where the plaintiff did not receive permission to demolish a historic building on its property because there was other empty space on campus to construct its intended new building).

Several other circuits have likewise found no substantial burden under § 2000cc(a)(1) where, as here, adequate alternative locations were available for religious exercise. See, *e.g., Marianist Province of United States v. City of Kirkwood*, 944 F.3d 996, 1001 (8th Cir. 2019) (concluding that there was no substantial burden where the plaintiff high school was "limited to using its baseball field only during daylight hours, as it has for decades … [where] Vianney has alternative times and locations, such as at its baseball field during the day and its football and soccer facility at night, to carry out its religious mission"); *Livingston Christian Sch. v. Genoa Charter Twp.*, 858 F.3d

996, 1009 (6th Cir. 2017) (observing that "families [of students] with especially tight budgets or busy schedules might find burdensome the additional expenses and time constraints" of having to drive an extra 12 miles to school, "but this does not mean that such additional expense and time is so great as to constitute a substantial burden on [the plaintiff's] religious mission"); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1228 (11th Cir. 2004) (concluding that there was no substantial burden where congregants were required to walk several extra blocks to an alternative synagogue site).

The alternative venues in this case are in the same general community within the City of Madison as Edgewood and, according to the evidence developed during discovery, remain available to host nighttime events. Given these alternative sites, we cannot see how the City's zoning decisions imposed a substantial burden on Edgewood's religious mission. Indeed, the high school has never hosted nighttime competitions on its athletic field but has carried out its religious mission all the same for over 100 years. And all indications are that Edgewood can continue to host competitions at its home field during the daytime hours.

Switching tacks, Edgewood insists that it endured "delay, uncertainty, and expense" in pursuing lighting at its athletic field to the point of suffering a "substantial burden" on the exercise of its Catholic faith. We suggested that "delay, uncertainty, and expense" may contribute to a substantial burden in *Saints Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, but under very different facts. See 396 F.3d 895, 901 (7th Cir. 2005). The religious institution in *New Berlin* sought to build a new church on already-purchased land in a nearby city because its congregation was outgrowing the

present facility. See *id.* at 898. The city committed a series of legal errors during the rezoning process that significantly delayed the building project (to include making it more difficult for the church to raise the $12 million necessary to fund construction), casting "doubt on the[] [city's] good faith." *Id.* at 899. The flagrancy of the city's legal errors—coupled with our related determination that the church had complied with the relevant ordinances almost from the beginning—prompted the observation that the church would suffer "unreasonable delay" by having to restart a permit process that it had already satisfied. *Id.* at 900.

Edgewood, by contrast, has suffered uncertainty and delay with respect to a much smaller scale request—a lighting permit—the denial of which does not pose the type of existential threat to religious mission implicated in *New Berlin*. Nor does the record permit an inference of bad faith. The City has reasonably maintained since the beginning of this saga that Edgewood's master plan did not allow lighting for nighttime games. The City's denial of Edgewood's lighting permit application aligned with that consistent position. A reasonable juror could only conclude that subsequent actions—such as the City's amendment to the Campus-Institutional District ordinance and its denial of Edgewood's conditional-use application—were not motivated by "bad faith" or religious animus, but instead responded to the community's concerns about lights and noise. On this record, a jury could not find that Edgewood's frustrations with the lighting process imposed harm that amounted to a substantial burden on its Catholic mission. See *Civil Liberties for Urban Believers*, 342 F.3d 752, 762 (7th Cir. 2003) (rejecting the plaintiff's claim that the "costs, procedural requirements, and inherent political

aspects" of the zoning approval process imposed a substantial burden within the meaning of RLUIPA).

The district court correctly concluded that while Edgewood's inability to use its athletic field at night presents an inconvenience, and perhaps understandable source of frustration for the high school, the City's denial of the lighting permit does not rise to the level of a substantial burden on religious exercise under RLUIPA.

## C

That brings us to the constitutional claim Edgewood brought under the Free Exercise Clause. Recall that the district court did not address the claim on the merits, explaining that RLUIPA is just as restrictive as the Free Exercise Clause—if not more so. See *Schlemm v. Wall*, 784 F.3d 362, 363 (7th Cir. 2015) (bypassing First Amendment claims because "[RLUIPA] provides greater protection"); *Vision Church*, 468 F.3d at 996 (analyzing the plaintiff's Free Exercise and RLUIPA substantial burden claims together "[g]iven the similarities between RLUIPA § 2(a)(1) and First Amendment jurisprudence"). Because Edgewood has provided no compelling reason to distinguish or revisit any aspect of this precedent, we affirm the dismissal of the Free Exercise claim.

## III

Finally, Edgewood contends that it acquired a "vested right" to install lights at its athletic field. Under Wisconsin law, a "right to build" vests when the landowner submits a permit application that "conforms to the zoning or building code requirements in effect at the time of application." *McKee Fam. I, LLC v. City of Fitchburg*, 893 N.W.2d 12, 15 (Wis. 2017); see also Wis. Stat. § 66.10015(2)(a). Wisconsin defines a

"vested right" as a "right that so completely and definitely belongs to a person that it cannot be impaired or taken away without the person's consent." *Stoker v. Milwaukee Cty.*, 857 N.W.2d 102, 109 (Wis. 2014) (quoting Black's Law Dictionary 1520 (10th ed. 2014)). Wisconsin's "Building Permit Rule" is an exception to the general rule that "zoning does not create vested rights." *McKee Fam. I*, 893 N.W.2d at 20.

The district court rightly rejected this claim on the merits because Edgewood's application for a lighting permit did not conform with the municipal zoning requirements in effect at the time, namely, Edgewood's master plan. The City's lighting ordinance stated that a permit applicant must conform with "all other codes and regulations as applicable." M.G.O. § 10.085(1). Edgewood's master plan, an enacted city ordinance, constituted an "applicable" regulation under the lighting ordinance at the time the school submitted its permit application.

The Campus-Institutional District ordinance, in turn, provided that "[n]o alteration" of a plan would be permitted unless approved by the City of Madison's Plan Commission. *Id.* § 28.097(8). Edgewood's plan nowhere identified field lighting as an "existing" or "proposed" condition. Especially because the lighting request sought to facilitate nighttime games, it amounted to more than a "minor" alteration to the master plan, thus requiring Plan Commission approval. See *id.* Absent such approval, the improvement did not comply with the master plan and so could not have complied with the City's lighting ordinance. The district court was right to enter summary judgment for the City on Edgewood's vested rights claim.

For these reasons, we AFFIRM.